TRANSPORTATION PLAZA ASSOCIATES *v.* ARTHUR B. POWERS, COMMISSIONER OF TRANSPORTATION, ET AL.
(12750)
(12751)
(12752)

PETERS, C. J., SHEA, SANTANIELLO, DUPONT and F. HENNESSY, Js.

Argued February 4—decision released May 5, 1987

*Mark S. Shipman,* with whom were *I. Milton Widem* and, on the brief, *Leonard M. Bieringer, Edith S. Rosen* and *Cindy S. Schwartz,* for the appellant-appellee (defendant city of Stamford).

*Brewster Blackall,* assistant attorney general, with whom, on the brief, was *Joseph I. Lieberman,* attorney general, for the appellant-appellee (named defendant).

*Joseph Adinolfi, Jr.,* with whom were *Joseph C. Morelli* and, on the brief, *John D. Miletti,* for the appellee-appellant (plaintiff).

DuPont, J. The named defendant, Arthur B. Powers, commissioner of transportation (commissioner), took property known as the Stamford Railroad Station from the plaintiff, Transportation Plaza Associates (TPA), in an eminent domain proceeding and assessed damages in the amount of $3,230,000. TPA thereafter appealed to the Superior Court from that assessment. The case was referred to a panel of three state trial referees. See General Statutes §§ 52-434, 52-434a (b). At the commencement of the trial, the city of Stamford was allowed to intervene as a defendant. After a lengthy trial, the panel, sitting as the trial court, rendered judgment for the plaintiff in the amount of $6,500,000, plus appraisal fees and statutory interest. The defendants have appealed from that judgment and TPA has cross appealed. We find no error on the appeals or on the cross appeal.

The trial court's memorandum of decision contains an exhaustive discussion of the facts proved by TPA, as well as a discussion of the failure of the defendants to rebut those facts. The court made findings of facts, stated its conclusions, and discussed, in well reasoned terms, its review of the testimony of the appraisers of the parties and its reasons for its determination of the damages to be awarded to TPA. The court's decision is well written and thorough in its analysis.

The factual background of this appeal is stated in the court's decision. The property condemned was acquired by TPA in 1968 and consists of two parcels of land, totalling 5.48 acres or 238,760 square feet. The parcels are divided by the east and westbound tracks of the Metro North railroad. In addition to the land itself, TPA owned the air rights above the railroad tracks, beginning at a level of forty-seven feet above the top of the rails, as well as the right to use an existing tunnel underneath a railroad right-of-way which connects the two parcels.

After acquiring the land, TPA engaged in a number of activities in preparation for its development. Between 1969 and 1971, TPA made four applications to the Stamford planning and zoning board, seeking changes to improve the zoning conditions governing the parcels. In 1971, the last application was granted, resulting in a change in the zoning regulations as they applied to the area, height and bulk of the buildings which could be located thereon. The change in zoning regulations allowed TPA to develop a maximum sized office complex of 966,978 square feet with a similar amount of square footage for parking. From 1972 to 1976, TPA conducted negotiations with the Connecticut department of transportation, rail division, in an attempt to obtain air rights beginning at a twenty-three foot level instead of the forty-seven foot level. These negotations were not fruitful.

Between 1970 and 1980, prospective tenants contacted TPA concerning the construction of an office building. TPA conducted a design contest among several architectural firms in order to develop a set of plans for a structure which would be feasible on the site. In 1973 and in 1977, TPA retained architects who developed plans for an office building and a parking structure. In early 1980, TPA again retained architects to develop a plan which would demonstrate the highest and best use of the property.

TPA became aware in 1976 that the state wanted to develop the property as a central transportation center. In the 1977 session of the legislature, a special act was passed concerning the state's taking of the land which was never implemented, and in 1979, the legislature passed another special act empowering the state to acquire the property by eminent domain. In 1980, TPA brought an inverse condemnation action for damages, alleging a de facto taking of its property without compensation. The commissioner subsequently filed

a notice of taking and statement of compensation, pursuant to an agreement with TPA that its action would be withdrawn. The commissioner based his statement of compensation on the assumption that the property taken was subject to an eighty foot right-of-way, which he claimed was depicted on a map referred to in the description of the property filed with his statement.

The defendants claim that the trial court erred in its reassessment of the amount of compensation to be paid to TPA because it: (1) exceeded the scope of its jurisdictional reference pursuant to General Statutes §§ 8-132 and 52-434a; (2) found that there was a reasonable probability that TPA could have erected a particular structure on the land as the highest and best use of the land but for the condemnation; and (3) concluded that an eighty foot wide right-of-way did not exist on the property.[1] TPA's cross appeal claims that the court, in arriving at its determination of value, twice deducted the sum of $1,000,000 for special costs from the fair market value of the property.

I

The defendants, in their first claim of error, assert that a trial court consisting of state trial referees may not consider title issues, absent a specific reference to do so, because the consideration of such issues exceeds the scope of its jurisdictional reference pursuant to General Statutes §§ 8-132 and 52-434a.[2] They therefore

[1] The parties agree that the land is encumbered by at least a fifty foot right-of-way. The defendants claim that this fifty foot right-of-way lies within the eighty foot right-of-way.

[2] During oral argument, the defendant city also claimed that the allegations of TPA's complaint did not conform to the proof, and that, therefore, the court was precluded from considering the question of whether TPA's title was encumbered by a right-of-way less than eighty feet in width. The only reference to the pleadings in the defendants' brief is one sentence which states that no quiet title issues were raised in the pleadings. The thrust of the defendant city's oral argument was that the court was bound by the description of the realty used in the complaint which referred to

claim that the trial court was without jurisdiction to determine that an eighty foot right-of-way did not exist on TPA's property.[3]

The trial court consisted of state trial referees who have the same powers as judges of the Superior Court. General Statutes § 52-434 provides that "[t]he superior court may refer any civil, nonjury case . . . in which the issues have been closed to . . . a state referee who shall have and exercise the powers of the superior court in respect to trial, judgment and appeal in the case." General Statutes § 52-434a (b) specifically provides for the appointment of three state trial referees by the chief court administrator in condemnation proceedings in which damages exceed $200,000. These referees "shall have and may exercise with respect to any civil matter . . . the same powers and jurisdiction as does a judge of the court from which the proceedings were referred." General Statutes § 52-434a (a).

The defendants argue that General Statutes § 8-132 limits the jurisdiction of the trial court to a revision of the statement of compensation. The defendants interpret § 8-132 as meaning that state trial referees, absent

a map showing an eighty foot right-of-way. The parties agreed during oral argument, however, that during the discovery process, the issue of the width of the right-of-way was raised. The defendants did not raise with any specificity any issue in the trial court as to the failure of the pleadings to conform to the proof; and such an issue need not be reviewed here. See *DeFonce Construction Corporation* v. *State,* 198 Conn. 185, 186 n.1, 501 A.2d 745 (1985); *State* v. *Tyler-Barcomb,* 197 Conn. 666, 672, 500 A.2d 1324 (1985). Furthermore, it is extremely likely that the court would have granted a motion to amend the pleadings had TPA so moved.

[3] The defendants also claim that the court had no jurisdictional power to state that a particular spur track "appeared [to be] abandoned" and not used by the railroad because that determination was also a title issue. The discussion in the text of this opinion relating to the right-of-way applies equally to the court's jurisdiction to determine whether the location of the spur track encumbered the subject property. The court found that this track could be removed by TPA because it extended onto its property and was not specifically reserved by deed.

a more specific statutory reference, may revise a statement of compensation only as to the amount of damages assessed, but not as to the description of the property taken.

The condemnation proceeding was filed by the commissioner pursuant to General Statutes § 8-129, which requires the taking authority to determine the compensation to be paid and to file a statement of compensation. Section 8-129 further requires that the statement of compensation contain a description of the property to be taken by eminent domain. Section 8-132 specifically enables persons claiming to be aggrieved by the statement of compensation to obtain a review of such statement. This statute does not limit the review afforded to the plaintiff to merely the amount of damages assessed, but rather extends such a review to the *entire* statement of compensation. Since the statement of compensation contains a description of the real estate, it would be a strange and strained interpretation of § 8-132 to consider it as standing in isolation from § 8-129 and therefore as being unrelated to the description of the land condemned. A description of land, of necessity, encompasses the precise amount of land involved. It is difficult to understand how a panel of state trial referees could revise a statement of compensation without first determining, if necessary, the precise amount of land taken. In any condemnation proceeding involving the assessment of damages, one of the main issues that must necessarily be resolved by the court is the amount of land taken. See *Kelly* v. *Waterbury*, 108 Conn. 205, 207, 143 A. 96 (1928). Moreover, § 8-132 requires the referees, in reviewing the statement of compensation, to view the property. A parcel of land cannot be viewed without ascertaining its boundaries. Finally, § 8-132 empowers the trial referees, after hearing the parties and viewing the property, to revise such statement in any manner as they

deem proper. This broad power afforded to the referees clearly includes the power to revise the description of the property.

The defendant city represented to the court that if the issues of title and damages were bifurcated, it would be willing to have the same court listen to both issues. Accordingly, it was not harmed by the same court listening to the entire case at once.

The defendants also argue that the court should first have obtained a specific reference in order to determine questions of title. This argument ignores the fact that the court already had all the powers and jurisdiction of the Superior Court, ignores a reasonable interpretation of §§ 8-129 and 8-132, and ignores existing case law. Several cases, expressly or implicitly, indicate that title questions may be considered at the same trial in which the assessment of damages is reviewed. *Laurel, Inc.* v. *Commissioner of Transportation,* 180 Conn. 11, 428 A.2d 789 (1980) (lack of access to a highway when that access is not described or shown in the certificate of taking or on its accompanying map is an element of damages); *Kelly* v. *Waterbury,* supra, 208 (evidence of whether a portion of land taken was owned by the plaintiff was relevant to an assessment of damages and should not have been excluded); *Campbell* v. *New Haven,* 101 Conn. 173, 125 A. 650 (1924) (claim that additional parcel of land was obtained by adverse possession was too speculative to be considered in the assessment).

The cases cited by the defendants in support of their position are inapposite to the present case. All of these cases; *Hanson* v. *Commissioner of Transportation,* 176 Conn. 391, 408 A.2d 8 (1979); *D'Addario* v. *Commissioner of Transportation,* 172 Conn. 182, 374 A.2d 163 (1976); *Plunske* v. *Wood,* 171 Conn. 280, 370 A.2d 920 (1976); relate to *partial* takings of a plaintiff's land

for state highway purposes.[4] See General Statutes §§ 13a-73, 13a-76. None of these cases relates to issues of title or is concerned with the precise amount of land taken.

The title issue of this case has no independent significance outside the bounds of the revision of the statement of compensation. The only significance of the title issue relates to the amount of compensation to be awarded. The state has taken *all* of the land of TPA, and whatever the footage of the right-of-way, both the dominant and servient title interests had merged and

[4] Two of the cases relied upon by the defendants, *D'Addario* v. *Commissioner of Transportation*, 172 Conn. 182, 374 A.2d 163 (1976), and *Plunske* v. *Wood*, 171 Conn. 280, 370 A.2d 920 (1976), relate to the proper measure of damages to be awarded for the depreciation in market value of the land remaining after the taking. These decisions make it clear that expenses arising from curing injuries sustained by the remaining land which was not condemned are not recoverable per se in an appeal pursuant to General Statutes § 13a-76, but may be evidence which would sustain a finding that the remaining land has suffered a decrease in market value which was foreseeable and which was the proximate result of the taking. If the diminution in market value of the remaining land was not the proximate and foreseeable result of the taking but of an injury caused by the negligence of a contractor hired by the condemnor to effectuate the project, damages for such negligence are ordinarily not recoverable in the reassessment of damages proceedings of § 13a-76, but in an independent proceeding against the contractor. See *Plunske* v. *Wood*, supra, 284. *Hanson* v. *Commissioner*, 176 Conn. 391, 408 A.2d 8 (1979), involved the jurisdictional authority of a committee of three state trial referees to consider "the amount or value of all benefits" resulting from a taking for highway purposes when the commissioner had not previously made any finding of benefits. See General Statutes § 13a-73 (b). In that case, the landowner had no notice that the state intended to assess the owner with payment to the state for the value of any benefit to its remaining land.

It should be noted that these cases involved appeals filed pursuant to § 13a-76, which enables aggrieved parties to obtain a reassessment of damages and empowers the trial court to "reassess such damages and benefits so far as they affect such applicant. . . ." The present case, however, was filed pursuant to General Statutes § 8-132, which specifically empowers the trial court to "revise [the] statement of compensation in such manner as [the court] deems proper. . . ."

vested in the state upon the taking. It would make no sense, therefore, to litigate a title issue in an independent proceeding.

The determination of the width of the right-of-way cannot be divorced from the determination of the fair value of the land taken, and we hold that the court did not exceed its jurisdiction in making that determination.

## II

Once the claim, relating to the jurisdiction of the court to determine the title issues at the same time as damages, is resolved, the case becomes the stereotypical one in which a party claims that the trial court's decision was clearly erroneous. In spite of its voluminous record, this case is, very simply, one in which the defendants challenge the legal or factual conclusions of the court and the findings of fact upon which those conclusions rest.

The court found that the highest and best use of the property was to construct a large office building with garage structures on it and concluded that it was reasonably probable that the land, but for the taking, would have been devoted to that purpose by a prudent investor in the near future. Four schemes of development of the parcel were introduced into evidence by TPA. The court relied upon only one of them in determining damages. That plan was based upon the existence of a fifty foot right-of-way across the parcel and the elimination of a spur track.[5]

The defendants claim that TPA failed to prove that there was a reasonable probability that, but for the con-

[5] TPA claims that any one of the four plans was feasible, including one which assumed the existence of an eighty foot right-of-way and the existence of part of a spur track on its land. The court considered only one of the plans because it concluded that neither assumption was true.

demnation, it could have erected the specific structure depicted on the plan chosen by the court, and that, therefore, the court could not award damages based upon a finding of such probability. The defendants view the particular structure as shown on the plan of TPA as a "mythical structure." The court, in its careful analysis of the evidence, concluded that the plan could have been a reality but for the condemnation. The court found that TPA's plan complied with existing zoning regulations,[6] that the overhead transmission lines could feasibly be removed, and that the catenary system of the railroad could be relocated at an economically feasible cost. The court further found that the building could be constructed in a reasonable time at a construction price which TPA could finance. Furthermore, it was reasonably probable that the plan would have been approved under the Coastal Management Act; General Statutes §§ 22a-90 through 22a-112; and that an air quality permit could have been obtained. The trial court also reasonably found that the structure's effect on air quality would have been within the maximum allowable limits of the state and federal governments, and that the traffic generated by the project would not have caused the state or city to deny approval of the project. Moreover, TPA did not have to provide commuter parking for users of the railroad,[7] and could have complied

[6] The court found that the parcels were one contiguous buildable piece of land, including the air rights, and as such, qualified under the zoning regulations for a maximum site coverage of 90 percent even though the parcels were divided by railroad tracks. Based upon the plan relied upon by the court, even if only one of the parcels were considered a "corner site" under the zoning regulations, the site coverage would not exceed 80 percent. The court, however, found that the two parcels did constitute a "corner site." The court further found that the zoning regulations did not prohibit the use of air rights, that others in the city had been allowed to utilize air rights, and that air rights are a property interest which may be assessed and taxed by the city.

[7] TPA claimed that, in any event, users would have 769 parking spaces under the plan chosen by the court as feasible.

with any railroad requirements necessary for blasting and construction at an economically feasible cost.

The basic disagreement of the parties revolves not around the law to be applied as expressed in the cases cited by both, but in the application of that law to the facts of this case. The defendants claim that TPA's architectural plans, which were introduced into evidence to show the highest and best use of the land, were erroneously admitted because they were speculative and were introduced without a proper foundation.

The general rule, as stated in numerous cases, is that evidence of the probability of a zoning change is admissible because it is a factor which would be considered by a buyer in the determination of market price. *Laurel, Inc.* v. *Commissioner of Transportation,* supra, 33; *Heath* v. *Commissioner of Transportation,* 175 Conn. 384, 398 A.2d 1192 (1978); *Levine* v. *Stamford,* 174 Conn. 234, 386 A.2d 216 (1978); *Talarico* v. *Conkling,* 168 Conn. 194, 362 A.2d 862 (1975); *Lynch* v. *West Hartford,* 167 Conn. 67, 355 A.2d 42 (1974); 4 P. Nichols, Eminent Domain (3d Ed.) § 12.3142 [2]; 1 L. Orgel, Valuation Under Eminent Domain (2d Ed.) § 31. The determination of whether there is a reasonable probability of a zoning change is a question of fact for the trier, and will not be disturbed if the facts amply support its conclusion. *Heath* v. *Commissioner of Transportation,* supra, 390. Evidence of the special adaptability of land for a particular purpose is properly admitted if there is a reasonable probability that the land could be so used within a reasonable time and with economic feasibility. *Russo* v. *East Hartford,* 179 Conn. 250, 256, 425 A.2d 1282 (1979), cert. denied, 445 U.S. 940, 100 S. Ct. 1334, 63 L. Ed. 2d 773 (1980); *Connecticut Printers, Inc.* v. *Redevelopment Agency,* 159 Conn. 407, 270 A.2d 549 (1970); *Campbell* v. *New Haven,* supra; 27 Am. Jur. 2d, Eminent Domain § 280; 4 P. Nichols, supra. The fair market value of

realty is determined in light of the use to which it is being put at the time of the taking or to which it *could* be put most advantageously. *Gray Line Bus Co.* v. *Greater Bridgeport Transit District,* 188 Conn. 417, 420, 449 A.2d 1036 (1982). The use to which land can be put with reasonable probability is part of the standard scenario of hypothetical negotiations between a willing buyer and seller.

The leading case of *Budney* v. *Ives,* 156 Conn. 83, 239 A.2d 482 (1968), upon which the defendants rely, elaborates on the holding of *Campbell* v. *New Haven,* supra. The latter case holds that the plans of the plaintiff showing the adaptability of the land's development in accordance with those plans was admissible to show the plaintiff's contemplated use of his property. The former case holds that if a zoning change is reasonably probable, that fact may be considered in determining fair value. The value is to be determined as of the taking date, but that value should contain a factor for the likelihood of the zoning change, because that factor would affect the market value. *Lynch* v. *West Hartford,* supra, 74.

In the present case, the probability of obtaining the necessary administrative approvals for the construction of a project which was the highest and best use of the land was interwoven with the introduction into evidence of the plan for the project. The defendants argue that there was no proper foundation for such introduction. It would be impossible to lay a foundation for the introduction of the particular plan by first establishing the probability of receiving a myriad of specific administrative approvals. Approvals and permits do not exist in a vacuum, but rather relate to and allow particular things. The case of *Rushchak* v. *West Haven,* 167 Conn. 564, 356 A.2d 104 (1975), relied upon by the defendants, required a showing of the probability of a zone change to a multifamily zone as a foundation

for the introduction into evidence of a plan for multi-family dwellings. Id., 568–69. That case differs factually from this case. Here, the probabilities of obtaining a host of administrative approvals for a specific plan cannot be divorced from that plan, and the plan had to be admitted into evidence in order to determine the probability of its fruition.

The defendants claim both that TPA did not prove that it could have obtained all of the necessary state and local approvals from the administrative agencies involved because those persons in a position to actually grant the approval involved did not testify, and that the only such person who did so testify believed that approval would not be forthcoming. Proof of the reasonable probability that land could be put to a particular use need not be established by the testimony of the particular administrative officials involved. In *Lynch* v. *West Hartford,* supra, two appraisers testified that in their opinion, a zone change would have been granted, and in *Campbell* v. *New Haven,* supra, the landowner himself testified as to his proposed use of the land and its adaptability to that use. Furthermore, the testimony of the official in the present case who believed approval would not be given was seriously discredited on cross-examination. A trial court may accept or reject the opinion of expert witnesses. Here, it chose to accept the opinions of TPA's witnesses regarding the probability of obtaining the various administrative approvals. That acceptance lay within its discretion. *Ferri* v. *Pyramid Construction Co.,* 186 Conn. 682, 443 A.2d 478 (1982).

The court had sufficient evidence from which it could have concluded that it was reasonably probable that TPA's land, but for the taking, could have been devoted to the proposed use, as shown on the architectural plan submitted to it, by a prudent investor in the near future. *Tandet* v. *Urban Redevelopment Commission,*

179 Conn. 293, 299, 426 A.2d 280 (1979). That use was reasonably probable and affected the market value of the land as of the date of the taking.

In its memorandum of decision, the court extensively discussed the testimony and exhibits which led to its conclusion that only a fifty foot right-of-way encumbered TPA's land. It chose to find TPA's title expert more convincing than the defendants' title expert. Additionally, the court discussed at length the testimony of the real estate appraisers of the parties. It concluded that the testimony of TPA's appraiser was more convincing. "The credibility of 'expert witnesses and the weight to be accorded to their testimony are within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible.' *New Haven Water Co.* v. *Board of Tax Review,* 166 Conn. 232, 240, 348 A.2d 641 (1974)." *Ferri* v. *Pyramid Construction Co.,* supra, 690.

The court found that the fair market value of the land, calculated at $31.50 per square foot for 238,760 square feet was $7,520,940, and then deducted $1,000,000 to cover the reasonable estimate of the cost of railroad electrification and catenary relocation. It rounded off the sum of $6,520,940 to find that the fair market value was $6,500,000.

The trial court's legal and factual conclusions are not clearly erroneous because they are supported by the facts stated in its memorandum of decision, and the subsidiary facts themselves are supported by the evidence. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980); *Heath* v. *Commissioner of Transportation,* supra, 390.

### III

TPA claims in its cross appeal that the court erroneously deducted the same sum twice as "special deduc-

tions" from the fair market value. After a lengthy discussion of the testimony of the parties' appraisers, the court reached its own conclusion of the market value per square foot. The court was "charged . . . with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, [its own] general knowledge and [its] viewing of the premises." *Birnbaum* v. *Ives,* 163 Conn. 12, 21, 301 A.2d 262 (1972). It did so. It multiplied the square footage by the price found by it as the market value per square foot and deducted a sum for special costs.

If TPA believed that there was an ambiguity in the trial court's reasoning or in the calculation of the damages awarded to it, it should have moved for an articulation of the memorandum of decision.[8] *Carpenter* v. *Carpenter,* 188 Conn. 736, 739 n.2, 453 A.2d 1151 (1982); *Pointina Beach Assn., Inc.* v. *Stella,* 1 Conn. App. 341, 343, 471 A.2d 970 (1984). This case does not involve a mathematical error, as TPA claims, and should not be remanded to the trial court for a correction since none is necessary. Cf. *Feneck* v. *Nowakowski,* 146 Conn. 434, 151 A.2d 891 (1959).

There is no error on the appeals or on the cross appeal.

In this opinion the other justices concurred.

---

[8] The plaintiff filed a motion for articulation in connection with the award of appraisal fees and was, therefore, cognizant of the procedure.