## PETER ROCK ASSOCIATES *v.* TOWN OF NORTH HAVEN

Superior Court     Judicial District of     File No. CV960393625
New Haven

Memorandum filed August 13, 1998*

* Affirmed. *Peter Rock Associates* v. *North Haven,* 59 Conn. App. 1, 756 A.2d 290 (2000).

*Howard, Kohn, Sprague & Fitzgerald,* for the plaintiff.

*Ciulla & Donofrio,* for the defendants.

HON. JOHN N. REYNOLDS, HON. ARTHUR H. HEALEY, HON. SAMUEL S. FREEDMAN, JUDGE TRIAL REFEREES.[1] On August 6, 1996, the town of North Haven (town) filed its duly and properly authorized statement of compensation at the Superior Court, in the judicial district of New Haven, and the plaintiff, Peter Rock Associates (Peter Rock), a Connecticut limited partnership,[2] has appealed therefrom, alleging that it is aggrieved by it.

This action was predicated on a vote of the town's board of selectmen (board) on July 11, 1996, to acquire by purchase or condemnation the subject property in North Haven "for open space, recreational or other municipal purposes" and recommended that $2,375,000 be appropriated for that purpose. The town electors approved, at a special town meeting held on July 22, 1996, a resolution authorizing the appropriation of $2,375,000 for the acquisition of the property "for open space, recreational and other municipal purposes." On August 5, 1996, the board voted to institute eminent domain proceedings to acquire the property, having failed to agree on a sales price with the owner, Peter Rock.

---

[1] On February 17, 1997, pursuant to General Statutes § 52-434a (b), the chief court administrator referred the present cause of action to a committee of three judge trial referees (committee), to be disposed of according to law.

[2] Peter Rock Associates consists of one general partner and eight limited partners.

In a separate action,[3] the town, on August 19, 1996, filed a certificate of taking whereupon Peter Rock filed a motion for payment of deposit. Peter Rock's motion was granted on September 23, 1996. The town paid Peter Rock $2,375,000 pursuant to court order on October 16, 1996. Peter Rock then filed the present appeal and application for review of statement of compensation condemnation. The committee heard evidence from April 13 through April 15, 1998, viewed the property on May 21, 1998, reviewed the pleadings, exhibits, briefs and appraisal reports filed by the parties, discussed the matter in conference and examined the controlling law.

The specific matter before the committee is to determine the fair market value of the fee simple interest of the 182 acres, more or less, of raw, undeveloped land in North Haven taken by the town and to file a report revising the statement of compensation if that is so concluded in such manner as the committee deems proper.

By far, the greater part of the 182 acres was acquired by Peter Rock by deed in 1969. In December, 1990, the balance of some eighteen acres was acquired by deed from Yorkview Associates (Yorkview). About 176 acres are zoned R-40 residential (minimum 40,000 square feet), about five acres are zoned R-20 residential (minimum 20,000 square feet) and about one acre is zoned CB-20 business. Throughout the trial and in their post-trial briefs, the parties have treated the entire 182 acres in the R-40 zoning context. The property has approximately 1425 feet of noncontiguous frontage on Middletown Avenue.[4] Additional frontages are located along

[3] *North Haven* v. *Peter Rock Associates*, Superior Court, judicial district of New Haven, Docket No. CV960390020.

[4] Middletown Avenue also is known as state Route 17.

Hermitage Lane and Rock Lane as well as an undeveloped street stub extending from Rabbit Road in East Haven.[5]

The property consists of an irregularly shaped parcel of land with mixed topography that climbs generally from west to east up to and surrounding the thirteen acre Peter's Rock Park[6] at its terminus with Hermitage Lane. The property, which is moderately to heavily wooded, rises from the Middletown Avenue frontage, in both gradual and steep grades, from thirty feet, more or less, to 360 feet, more or less, at its highest point in the easterly most portion of the property. This change takes place over a distance of approximately 3000 feet. There is a combination of level areas, as well as the upward and downward sloping areas of the property, some of which have steep grades throughout the site. There are also ledge outcroppings in some areas. The property is "laced" with approximately twenty-six to twenty-eight acres of wetlands[7] in various areas including approximately 45 percent of the Middletown Avenue frontage. All public utilities are directly available to the subject property along the Middletown Avenue frontage.

In 1988, Peter Rock filed an application for a 122 lot subdivision under R-40 zoning requirements and, as part of this application, the North Haven inland wetlands commission requested a report from King's Mark Environmental Review Team (team),[8] which team, as a pub-

---

[5] More specifically, the property is located at 129, 149 and 169–265 Middletown Avenue to 50–60 Hermitage Lane to the North Haven-East Haven town line.

[6] Peter's Rock Park itself is not part of the property, as it was already owned by the town prior to the condemnation.

[7] The town zoning regulations allow wetlands acreage to be used in computing permissible lot density.

[8] This team included a hydrogeologist, the district conservationist, an inland wetlands specialist, a wildlife biologist, a forester, a planner and a recreational planner.

lic service activity, is able to assist towns and developers in the review of sites proposed for major land use activities. In 1988, the team prepared a forty-four page report (King's Mark Report) describing and developing the attributes of the property. An executive summary of the King's Mark Report is in evidence in the present case and Peter Rock's expert conceded on cross-examination that he could not point to anything in the report that had changed from 1988 to the present time.

The King's Mark Report noted that the proposed subdivision by Peter Rock would encompass 122 house lots with five roads proposed to serve the subdivision. The report pointed out that slopes on the site "range from gentle to very steep" and that as to the five wetlands areas on the site, the soils in the wetlands areas are "poorly to very poorly" drained. The impact of the development on the wetlands will be, it said, "significant" and will "eventually change the overall character and quality of the wetlands." The report, while noting that the town "includes wetlands in [its] calculations of area for lots" also said that impact on wetlands may be substantial on lots with large areas in wetlands." The report further observed that the town master plan designated the area around Peter's Rock Park for "Natural Preservation Concept" protection with that plan showing low density residential and open space uses in the area. While observing that the property had some serious limitations, it suggested that a cluster approach to development "might be preferable to property of this type" as such a plan "could avoid areas with severe limitations and focus on areas that are better suited for development." The King's Mark Report indicated that the site was located in an R-40 zone and that the proposed plan complied with the existing zoning standards.

At trial, five witnesses testified on the issue of fair market value. This evidence was given by four experts

and the general partner of Peter Rock. Joseph Perrelli was Peter Rock's expert, and Donald Nitz, John Leary and Frederick Fox[9] were the town's experts. Perrelli, Nitz, Leary and Fox all submitted written appraisal reports, which were admitted into evidence. Perrelli,

[9] Peter Rock, in addition to attacking the Fox appraisal on value, also questioned it on other grounds. It argued that the appraisal has a valuation date of November 24, 1995, and that "it was not made for" Peter Rock but rather for an attorney representing the estate of Nicholas Papa, a deceased limited partner of Peter Rock, who died on November 24, 1995. Pointing out that the Fox appraisal was made for estate tax purposes, and not for use in discussion between a willing buyer and a willing seller, Peter Rock argues that it has been recognized that "valuations for tax purposes have little utility in condemnation proceedings," citing *Pisacich* v. *Burns*, Superior Court, judicial district of New London, Docket No. 512511 (May 16, 1991).

In *Pisacich*, the trial court noted that the condemnee placed emphasis upon the "tax value" as indicated by *town tax assessments* on the subject property as he claimed such value impacted on fair market value. In that case, the trial court noted that Nichols, a recognized commentator on eminent domain law had stated that: " 'It is almost everywhere the law that the value placed on a parcel of land for the purposes of taxation by the assessors of the town in which it is situated is no evidence of its value for other non tax purposes. This rule of exclusion has been applied in the determination of value in eminent domain proceedings.' 5 [P.] Nichols, Eminent Domain (3d Ed.) § 22.1, [pp. 22-1 through 22-4]; see *Martin Adm'x* v. *New York, New England Railroad Company*, 62 Conn. 331, 343, 25 A. 239 (1892); 39 A.L.R.2d 209, 214. One reason given for excluding it has been said to be that when offered as substantive evidence of market value it is hearsay and represent an ex parte statement of the assessor not subject to cross-examination, e.g., *Vine Street Corp.* [v.] *Council Bluffs*, 220 N.W.2d 860, 862 (Iowa 1974) and cases there cited." *Pisacich* v. *Burns*, supra, Superior Court, Docket No. 512511. That is not so in the present case as Fox, the appraiser, was subject to and did undergo cross-examination in his deposition, which is in evidence.

Another reason often given for excluding town assessors' value is that such an assessment is really res inter alios acta which, fairly translated means, in an evidentiary context, a thing or event which occurs at a time different from the time in issue and thus generally is not admissible to prove what occurred in issue. See Black's Law Dictionary 1310 (6th Ed. 1990). That is not true in the present case because the evidence established that there were no significant market changes in the raw land market from November, 1995 (the time of Nicholas Papa's death) and August, 1996 (the time of the condemnation in the present case).

Some suggestion is made that the tax appraisal not having been made for Peter Rock is a matter of some distinction. We think not because the estate of Nicholas Papa is a "party" to the Peter Rock appeal by virtue of

Nitz and Leary were examined and cross-examined. Fox's deposition was admitted into evidence. Stephen Papa, Sr. (Papa), who was Peter Rock's general partner, was examined and cross-examined at trial.

Material and testimonial evidence of fair market value of the property on August 6, 1996, at trial may be summarized as follows:

| Valuation Date | Appraiser | Total FMV | FMV/Per Acre |
| --- | --- | --- | --- |
| 11/24/95 | Fox | $2,275,000 | $12,500 |
| 12/12/95 | Nitz | 2,375,000 | 13,000 |
| 8/6/95 | Perrelli | 3,185,000 | 17,500 |
| 8/19/96 | Leary | 2,350,000 | 12,915 |
| at trial | Papa | 3,640,000 | 20,000 |

During the trial, various opinions regarding the fair market value of the property were given, both from experts and from Papa,[10] the general partner. An owner of real property has been held competent to testify as to its market value. *Misico* v. *LaMaita*, 150 Conn. 680, 684, 192 A.2d 891 (1963); see 5 P. Nichols, Eminent Domain (3d Ed.) § 23.05, p. 23-50. The opinion testimony of a landlord is admissible because of the presumption of special knowledge that arises out of the ownership of land. *United States* v. *Sowards*, 370 F.2d 87, 92 (10th

his having been one of the limited partners at the time of his death and his decedent estate not only has already shared in the $2,375,000 deposit already paid by court order, but also will participate in any increase in the original award that might be ordered in this proceeding.

In addition, we note, that despite the preparation of the Fox appraisal for estate tax purposes, Fox did testify that his assignment "was to estimate the market value of the subject property in order to comply with all laws." Parenthetically, it is to be noted that the "Definition of Market Value" set out in Fox's appraisal is the same as that set out in the appraisal of the plaintiff's expert, Perrelli. Fox has been an appraiser since 1961.

We will accord the Fox appraisal the weight to which we believed it may be entitled.

[10] Stephen Papa, Sr. is the owner of twenty-three percent of the condemned property. He acquired his interest in the property in 1969.

Cir. 1966). In condemnation cases, however, " '[c]are must be taken . . . not to substitute for reality the mere hope of the owner that the property might be used for some specific purpose.' " *United States* v. *Certain Parcels of Land in Cattaraugus Co., N.Y.*, 327 F. Sup. 181, 186 (W.D.N.Y. 1970), quoting *Matter of City of Rochester (Smith St. Bridge)*, 234 App. Div. 583, 586, 255 N.Y.S. 801 (1932). An owner, however, is qualified to express his opinion only in a reasonable way. 5 P. Nichols, supra, § 23.03, p. 23-29. One court has stated that "[t]he owner does not testify as just another expert, but from his unique position as the individual who stands to gain or lose the most from the tribunal's determination of the value of his property. The owner is draped with no cloak of expertise; the [committee] is aware of the owner's interests and free to evaluate his testimony, even to discard it altogether, in weighing the evidence." *District of Columbia Redevelopment Land Agency* v. *Thirteen Parcels of Land in Squares 859, 912, 934 and 4068 in the District of Columbia*, 534 F.2d 337, 340 (D.C. Cir. 1976). Papa was of the opinion that the subject property had a fair market value of $3,640,000 or $20,000 per acre when taken by the town.

"It is the court's duty to award just compensation to an owner whose property is taken for public use. The usual measure of just compensation is the fair market value or the price that would probably result from fair negotiations between a willing seller and a willing buyer, taking into account all the factors, including the highest and best or most advantageous use, weighing and evaluating the circumstances, the evidence, the opinions expressed by the witnesses and considering the use to which the premises have been devoted and which may have enhanced its value. . . . Put in another way, the rule is that the trier must take into consideration everything by which value is legitimately affected including those factors which a willing buyer

and a willing seller would consider in fairly and advantageously negotiating an agreement." (Citations omitted.) *Wronowski* v. *Redevelopment Agency*, 180 Conn. 579, 585–86, 430 A.2d 1284 (1980). "The paramount law intends that the condemnee shall be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken." *Colaluca* v. *Ives*, 150 Conn. 521, 530, 191 A.2d 340 (1963). Stated in another way, "[t]he function of the trial court in condemnation cases is to determine as nearly as possible the fair equivalent in money for the property taken." *Alemany* v. *Commissioner of Transportation*, 215 Conn. 437, 444, 576 A.2d 503 (1990).

The referees are the final judge of the credibility of witnesses and the weight to be given their testimony. *Morgan* v. *Hill*, 139 Conn. 159, 161, 90 A.2d 641 (1952). In this process the "trier's acceptance and use of the testimony . . . on some points does not preclude its rejection on others." Id., 162; see *Stanley Works* v. *New Britain Redevelopment Agency*, 155 Conn. 86, 99, 230 A.2d 9 (1967). The opinion of any expert is not binding upon the court. *Birnbaum* v. *Ives*, 163 Conn. 12, 20, 301 A.2d 262 (1972). "The purpose of offering in evidence the opinions of experts . . . is to aid the trier to arrive at his own conclusion, which is to be reached by weighing those opinions in the light of all the circumstances in evidence bearing upon value and his own general knowledge of the elements going to establish it. . . . Ultimately, the determination of the value of the land depend[s] on the considered judgment of the [committee members], taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties." (Citations omitted.) *Bennett* v. *New Haven Redevelopment Agency*, 148 Conn. 513, 516, 172 A.2d 612 (1961); see *Birnbaum* v. *Ives*, supra, 20; see also *Gentile* v. *Ives*, 159 Conn. 443, 451, 270 A.2d 680 (1970). "[T]he visual observations made by the trier

on a visit to the property are as much evidence as the evidence presented for [its] consideration . . . under oath." *White Oak Excavators, Inc.* v. *Burns*, 172 Conn. 478, 484, 374 A.2d 1097 (1977); *Gentile* v. *Ives*, supra, 452. "In condemnation proceedings, the trial court is more than a trier of facts or an arbiter of differing opinions of witnesses; it is charged with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, its general knowledge and its viewing of the premises." (Internal quotation marks omitted.) *French* v. *Clinton*, 215 Conn. 197, 201, 575 A.2d 686 (1990); see *Minicucci* v. *Commissioner of Transportation*, 211 Conn. 382, 388, 559 A.2d 216 (1989); *D'Addario* v. *Commissioner of Transportation*, 180 Conn. 355, 366, 429 A.2d 890 (1980).

The basic issue is for the committee to determine and arrive at the fair market value of the fee as of the date of the taking, August 6, 1996.

The evidence before this committee concentrated on the sales comparison approach as the best approach to arrive at the fair market value of the subject property. No evidence supported the cost approach or the income capitalization approach.

The four expert witnesses all agreed that the sales comparison approach to value was the appropriate approach in this matter.

In using the comparable sales approach, it must be remembered that the comparison is made with lands which are similar and because, no two parcels are exactly alike, parcels may be used as comparables where the dissimilarities are reduced to a minimum and allowance is made for any such dissimilarities. 4 P. Nichols, supra, § 12B.04[3], p. 12B-26; see 26 Am. Jur. 2d 712–13, Eminent Domain § 301 (1996). One court, citing Nichols, has stated that "[a] comparable sale must

be one that sufficiently resembles the parcel in question with respect to time, place and circumstances that reasonable men would consider it in evaluating fair market value. [P. Nichols, supra] § 13.02(4) 'Selection and Presentation of Comparable Sales'." *United States* v. *534.28 Acres of Land*, 442 F. Sup. 82, 84–85 (M.D. Pa. 1997). The most appropriate utility of the comparative sales approach must consider elements of comparison between comparable properties and the subject, and these include among others size, shape, character of the property, location, time of sales, use to which it is put, adaptability, zoning and available utilities. See 7 P. Nichols, supra, § 4.04[3], p. 4-45; *Campbell* v. *New Haven*, 101 Conn. 173, 185, 125 A. 650 (1924). In applying the comparable sales approach, the various elements of comparison are considered to adjust the known sales prices of the comparable properties to the subject and "Adjustments should be well supported by logic and reason and should also be documented in the appraisal." 7 P. Nichols, supra, § 4.04[3], p. 4-51. Comparability is a question of fact and the trier of fact has broad discretion in considering the matter of comparable sales. *United States* v. *819.98 Acres of Land in Wasatch & Summit Counties*, 78 F.3d 1468, 1471 (10th Cir. 1994); *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 223–25, 435 A.2d 24 (1980); *Wayne* v. *Kosoff*, 73 N.J. 8, 16, 372 A.2d 289 (1977). The weight to be given evidence of comparable sales is for the trier of fact. See 7 P. Nichols, supra, § 12B.04[3], pp. 128-B through 12B-29.

The four expert witnesses utilized a number of properties offered as comparable sales. All four used the Pine Hill tract in North Haven, comprising some 119 acres as a comparable and upon which a residential subdivision under R-40 zoning has been developed. Three of the experts, including the plaintiff's expert,

used the King's Highway property in North Haven, comprising some forty-six acres (composed of two noncontiguous parcels on opposite sides of King's Highway) as a comparable sale. Both portions of it are in an R-40 zoning district and the larger portion of about 30.76 acres was approved for a twenty-five lot subdivision in April, 1995. Two experts, one of whom was the plaintiff's expert, used an eighty-three acre parcel in Cheshire as a comparable sale. Thereafter, each of the experts (except Fox, whose appraisal utilized only the Pine Hill and King's Highway properties as comparables) all advanced different properties as comparables. These were seven in number and varied in size from about eighty acres to nine acres with one being in North Haven (comprising about fourteen acres and fronting on Middletown Avenue). The balance were parcels situated in East Haven (three), North Branford (one), Wallingford (one) and Middletown (one). The four experts were examined and cross-examined on the comparables they utilized. Their detailed and comprehensive appraisal reports were subject to thorough inquiry. The basis of their opinions was probed as was their experience as appraisers, not only in appraising raw land but as to what, where and how their proffered expertise has been pursued by each of them professionally. As to their opinions of value and the elements that went into such opinions, counsel thoroughly probed their methodology such as why particular comparables were selected, the plus and minus adjustments made in their comparables vis-à-vis the subject property, their knowledge of the history of the comparable and the subject property and where such factors as topography, size, location, amenities, adaptability, zoning, different market value climates and others impacted on fair market value. Claimed inconsistencies were competently explored. Their respective opinions of value, as explicated, generated weighty credibility issues for the panel to resolve.

The Leary report concluded that the highest and best use of the subject property is for residential subdivision at a development density of 90 to 102 lots.

The Perrelli report concluded that the highest and best use of the subject property is for a residential subdivision.

The Nitz report concluded that the highest and best use of the subject property would be for residential subdivision within the parameters of the R-40 zone regulations, if all necessary zoning requirements can be met, any needed wetlands approvals can be obtained and both feasibility and marketability studies are favorable.

The Fox report dated November 24, 1995, concluded that the highest and best use of the subject property is for single-family residential use.

"The concept of highest and best use [is] chiefly employed by appraisers as a starting point in estimating the value of real estate . . . ." *South Farms Associates Ltd. Partnership* v. *Burns*, 35 Conn. App. 9, 16, 644 A.2d 940, cert. denied, 231 Conn. 912, 648 A.2d 157 (1994).

The concept of highest and best use has been said to be "best defined" as " 'that reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.' " 7 P. Nichols, supra, § 4.04[4][a], p. 4-58; see *South Farms Associates Ltd. Partnership* v. *Burns*, supra, 35 Conn. App. 9.

The appraisal reports in evidence and the testimony of the appraisers plus the testimony of Papa, clearly support the unanimous conclusion of the committee members that the highest and best use of the subject property is for residential subdivision development.

"[C]ourts have adopted the approach that *raw land* as such, *with little or no improvements or preparation for subdivision* may not be valued as if the land were in fact a subdivision." (Emphasis added.) 4 P. Nichols, supra, § 12B-14 [1] [a], p. 12B-162. "The accepted rule for the evaluation of such land, therefore, is that the land will be considered in its present condition as a whole, with consideration given to any increment or enhancement in value due to the property's *present adaptability to subdivision development*." (Emphasis added.) Id., § 12B-14[1] [a], p. 12B-168. In determining its highest and best use, the trial referee must consider whether there is a reasonable probability that in the reasonably near future the subject property will be subdivided. *Budney* v. *Ives*, 156 Conn. 83, 91–92, 239 A.2d 482 (1968). The trial referee must make this determination not only from the testimony and physical evidence presented, but also from his or her own personal observation of the property. See General Statutes § 13a-76. "Under our law, a state referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises." (Internal quotation marks omitted.) *Minicucci* v. *Commissioner of Transportation*, supra, 211 Conn. 388.

"The 'highest and best use' concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." *State National Bank* v. *Planning & Zoning Commission*, 156 Conn. 99, 101, 239 A.2d 528 (1968); see *Robinson* v. *Westport*, 222 Conn. 402, 406–

407, 610 A.2d 611 (1992). "In determining its highest and best use the trial referee must consider whether there was a reasonable probability that in the reasonably near future the [zoning will be changed]." *Minicucci* v. *Commissioner of Transportation*, supra, 211 Conn. 385. It must, however, be stressed that "the true issue is, not the value of the property for the use which would be permitted if a change in zone was made, but the value of the property as zoned at the time of taking as it is affected by the probability of a [zone] change." *Budney* v. *Ives*, supra, 156 Conn. 89; *Greene* v. *Burns*, 221 Conn. 736, 745, 607 A.2d 402 (1992).

Zoning is an important factor to be considered when placing a value upon land. The credible evidence demonstrated the significance of the zoning history of the subject property. Peter Rock has owned the vast majority, 163 acres, since 1969.[11] Presumably, and there is no contrary evidence, the property has been in an R-40 zoning classification since that time. During the entire period from 1969 to 1988, Peter Rock has never filed and pursued to completion any application for a zoning application together with a subdivision approval. In 1988, however, Peter Rock filed an application proposing a 122 lot subdivision under the R-40 requirements.[12] The King's Market Report was filed in the context of that application and the evidence established that there have not been changes on the subject property to the time of trial. The inland wetlands commission denied the 1988 subdivision application and there was no appeal. In 1991, a proposal for an eighteen hole golf course (including seventy acres of open space) was

[11] The balance of the subject property, i.e., the so-called Yorkview acquisition of about eighteen acres, was purchased by Peter Rock in 1990.

[12] At all times in 1988 and since then, an R-40 zoning classification required a minimum of 40,000 square feet in lot area. The 1996 application which was denied and sought to have the zoning changed from R-40 to R-12 would have authorized a threefold increase in density (the R-12 zoning requires 12,000 square feet per residential lot).

approved by the town of North Haven's inland wetlands commission, but that was never developed. In 1995, a zoning application seeking a change from an R-40 zone to an R-12 zone for a proposed affordable housing subdivision was filed by one D'Amato, an option holder.[13] After hearings, it was denied by the North Haven planning and zoning commission in March, 1996. No specific number of lots/units was cited in that application, but the decision noted a potential range of 337 to 525 lots/ units if the zone change were granted. D'Amato, the option holder, appealed from this March, 1996 denial. In July, 1996, the town wrote to Peter Rock making a formal offer to purchase the subject property for $2,375,000, an amount that offer indicated that the parties had discussed earlier. The town also indicated at that time that if this amount were not acceptable, it would initiate eminent domain proceedings.

At this point, it may be said that Peter Rock argued at the trial that it had evidence to show that there was a reasonable probability of a zone change to allow "affordable housing" development of the subject property,[14] the effect of which probability, it claimed, would impact on the market value of the subject property. Included among the proffered evidence was the so-called option "agreement" it had with D'Amato on this property. This option "agreement" was offered into evidence on several occasions and its admission was denied each time. Evidence quite apart from the actual option but nevertheless concerning the option, was, however, before this court from both testimonial and documentary sources.

[13] Papa testified that D'Amato held an option on the subject property for 200 lots and for which, he said, a zone change from R-40 was necessary. The evidence discloses that a 200 lot subdivision is not possible under R-40 zoning. As noted, the application for zone change was denied in 1996 and no application for a subdivision which would also be needed, was ever made.

[14] See General Statutes § 8-30g et seq.

We recognize that because a change in zoning restrictions obviously could affect the price of real property, "where such a change is reasonably probable and not merely a remote or speculative possibility, the probability may properly be considered in the determination of the fair market value of the property taken by eminent domain." *Budney* v. *Ives*, supra, 156 Conn. 88; *Robinson* v. *Westport*, supra, 222 Conn. 405; *Transportation Plaza Associates* v. *Powers*, 203 Conn 364, 375, 525 A.2d 68 (1967). The burden of proving the reasonable probability of such a change is on the owner. See 4 P. Nichols, supra, § 12C.03[2], p. 12C-81. This burden was not sustained by Peter Rock.

Initially, we observe that Peter Rock, in vicariously asserting the "rights" of D'Amato under the option, appears to argue that the town's condemnation on August 6, 1996, coming as it did after D'Amato appealed the denial, injured Peter Rock. Then it argues that the town, by thus "mooting" D'Amato's appeal, caused it to suffer the "loss of opportunity" to render its property more valuable to it by the probability of a zone change from its present R-40 zoning. Peter Rock cites, on the timing of the town's action, *Budney* v. *Ives*, supra, 156 Conn. 83. A close reading of *Budney* shows that it is clearly distinguishable. In affirming the finding of a reasonable probability of a zone change to industrial or business in *Budney*, our Supreme Court noticed a recent change in zoning in the immediate area to permit the building of a large shopping center. In addition, it noted the existence of a gasoline station across the street from the subject property. Further, it observed that the property just east of the subject property had recently been rezoned industrial and that property to the west was zoned industrial. The *Budney* court also pointed out that the Manchester town master plan showed the subject property to be in an area proposed for an industrial use zone. No such circumstances exist

here. Indeed, there is evidence in the present case that the town master plan designates the area around Peter's Rock Park for "natural preservation protection" and that that plan shows low density residential and open space use in the area. The reasonable probability of a zone change analysis which looks to the "incremental factor" it adds to value should include a "degree of imminence." 4 P. Nichols, supra, § 12C.03[2], p. 12C-84. Such a change must be reasonably probable " 'and not merely a remote or speculative possibility . . . .' " *Greene* v. *Burns*, supra, 221 Conn. 744, quoting *Transportation Plaza Associates* v. *Powers*, supra, 203 Conn. 375. There is no such imminence here when the property was taken.

To suggest, as Peter Rock does, that because the town would have the burden of proof, as it would, on the zoning appeal from the denial of the D'Amato application under the affordable housing act, the town's "chances" of proving that its planning and zoning commission did not err in denying Peter Rock's application for a change of zoning to R-12 "were poor," does not, in the first instance, constitute an element of the reasonably probable zone change mix. It has been indicated that a court must tread carefully in deciding whether a local zoning body would probably not approve a particular subdivision plan because "[a]ny such forecast must be carefully scrutinized as it is difficult to project what a public body will decide in any given matter." *Delfino* v. *Vealencis*, 181 Conn. 533, 542, 436 A.2d 27 (1980); see *Rushchak* v. *West Haven*, 167 Conn. 564, 569, 356 A.2d 104 (1975). The same can fairly be said of forecasting as to when a court will decide that a local zoning commission will not sustain its burden of proof on an affordable housing appeal. See General Statutes § 8-30g (c). Even recognizing that if at the date of taking there is a reasonable probability of a change in the zoning ordinance in the reasonably near future

that may impact on value, we recognize that the influence of that circumstance upon market value may be shown. We cannot say that Peter Rock has demonstrated that reasonable probability.[15] Therefore, we evaluate market value as of the date of the condemnation and under the zoning existing as of that date.[16]

Despite the circumstances that there were serious conflicts in the evidence leading to the ultimate issue of fair market value, the experts reached a consensus that the highest and best use of the subject property was for residential subdivision purposes. We agree. We also conclude that the issue of compensation must be resolved in the context of the present R-40 zoning.

As we have already pointed out, the expert evidence as to fair market value was: $3,185,000 by Peter Rock's expert Perrelli, $2,375,000 by Nitz, an expert for the town, $2,350,000 by Leary, an expert for the town and $2,275,000 by Fox, an expert whose appraisal was offered by the town. The committee was impressed with

[15] It is clearly the obligation of the proponent to introduce evidence that it is probable a zoning change will be approved. *Transportation Plaza Associates* v. *Powers*, supra, 203 Conn. 377. Here, the proponent, in lieu of an offer of proof of the probability of zoning approval asked the panel to decide a third party's zoning appeal which had been withdrawn by that third party, D'Amato. This is not the function of this committee, especially when a zoning change was not the only precondition. Subdivision approval was also required. The history of this parcel vis-à-vis the North Haven zoning authorities reveals little effort on the part of the owners (over many years) to obtain the kind of use approvals they asked the committee to speculate about. The one application the proponents did file, was a subdivision request under the present R-40 zoning, which was rejected. In the absence of an offer of proof to establish some reasonable probability of change, this committee is left in a speculative quagmire as to the issue of zoning change. We will not base our decision on speculation.

[16] The plaintiff's expert (as did the other experts) gave his opinion of fair market value with no dependence on the D'Amato option. Moreover, quite apart from that option, his evidence did not demonstrate or even suggest that he had any view on whether there was, in his opinion of value, any element attributable by him to the reasonable probability of a zone change to R-12.

the "cluster" effect of the three appraisals submitted by the town. Leary, Nitz and Fox did not listen to each other's testimony. Moreover, there is no evidence that Leary or Nitz even knew of the other valuations. The appraisals of Leary and Nitz were $25,000 apart, and the earlier tax appraisal was $75,000 lower than that of Leary. There appears to be remarkable agreement between the three. We observe that both Leary and Nitz were credible witnesses.

The plaintiff's expert recognized that the concerns vis-à-vis potential development of the subject property in the King's Mark Report made in 1988 still existed at the time of trial. This report, which was commissioned by the town inland wetlands commission in the context of Peter Rock's 1988 change of zone application, adduces a cautious outlook for potential development as a residential subdivision without considerable work. The property, however, has some "serious limitations" including topography and the significant impact of development on wetlands (45 percent of which are along Middletown Avenue frontage). While it is correct that the King's Mark Report did opine in 1988 that "a cluster approach [to development] *might* be preferable with property of this type" nothing of that nature has been considered since then under the credible evidence. Indeed, the 1988 subdivision application which was for a 122-lot subdivision under the R-40 requirement and which was denied in 1988, was never appealed. The 1996 application for a zoning change filed by D'Amato was not for R-20 zoning just below R-40 but for R-12, and that too was denied. There is no other zoning history since Peter Rock bought the great majority of this property twenty-six years ago in 1969, except the golf course approval in 1991. The outcome of the recent zoning applications for the property operates to set the legal parameters for the legal uses of the property and economic return thereunder. Given the zoning history,

the nature of the property, and the activity concerning the property, it is difficult to give very much weight to the unsubstantiated evidence proffered as a potential for a "park-like" or "village" development. We say this aware that it is proper on the issue of determining value in eminent domain cases "to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land." *Andrews* v. *Cox*, 127 Conn. 455, 458, 17 A.2d 507 (1941). "A condemnation award cannot be based upon a speculative projected use for the property claimed by the owner." *Pacific Gas & Electric Co.* v. *Zuckerman*, 189 Cal. App. 3d 1113, 1146, 234 Cal. Rptr. 630 (1987).

All four experts agreed that the comparable sales approach to determining fair market value was the only method to use in the present case. In addition to what we stated earlier on this issue, however, we found the town's evidence more persuasive on comparable sales than that of Peter Rock. Generally speaking, this includes resolution of credibility issues which, in turn, includes the quality of the expertise and the degree of analysis employed. There were certain comparables that experts for both parties agreed were comparable and there were others offered as "comparable" by the various experts that were different properties (and this was so even between the town's experts). No two pieces of property are exactly alike and, precise guidelines as to degrees of similarity cannot be fixed. In evaluating and weighing that expert testimony on a comparable sale, we are aware that a comparable sale does not have to be similar in *all* comparative respects "so long as there is sufficient similarity in *some* significant respects to permit the expert testifying, or the fact-finder, to draw rational probative valuation inferences from the [comparable] sales cited, after weighing and allowing for such differences as do obtain between the properties sold and that which is the subject of the valuation litigation." (Emphasis added.) *Moorestown*

*Township* v. *Slack*, 85 N.J. Super. 109, 114, 204 A.2d 23, cert. denied, 43 N.J. 452, 205 A.2d 444 (1964). The expert evidence that developed the concept behind each of the factors of comparability used by the experts in reaching their opinion of value was explicated, sometimes convincingly and sometimes not.

Particularly significant was the evidence of the adjustments made by individual experts because the sales price of the particular comparable was a known fact and the dollar value of the subject property was not, and so adjustments to the particular comparable were often required to be made to make it as similar to the subject property as could be done. Evidence to claimed comparables made here included percentage adjustments. The factors going into the mix, both from the degree of percentage and the "similarity" factors to which the adjustment was applied produced serious conflicts in the evidence. We found the evidence of the town's experts much more credible and entitled to more weight than that adduced by Peter Rock in arriving at their respective opinions of market value and, ultimately, at our opinion of fair market value.

On the law and the credible evidence, the present committee of three judge trial referees finds that Peter Rock Associates is aggrieved and it concludes that the fair market value per acre of the subject property as of the date of taking (August 6, 1996) is $13,500 per acre for a total fair market value, as of, that date, of $2,457,000. The town has already paid $2,375,000 into the Superior Court, Peter Rock has already moved for the payment of that amount, and has been paid that amount. The balance due Peter Rock in damages for the taking of August 6, 1996, therefore, is $82,000 plus interest thereon, at the reasonable and just rate of 7.5 percent per annum from August 6, 1996, to the date of this judgment. See General Statutes § 37-3c.

Judgment in favor of the plaintiff, Peter Rock, is hereby entered in accordance with the foregoing.