[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Louis DeBeradinis Sr. (hereinafter "DeBeradinis") has appealed from the assessment of damages claiming that the amount of compensation in the sum of $4,430,000 deposited with the Court is inadequate and does not fairly and justly compensate him for his property.
On February 10, 1995, the City of Norwalk ("Norwalk") filed its amended statement of compensation representing the additional amount of compensation for the property over the original statement of compensation dated October 14, 1994 in the amount of 2.5 Million Dollars. A certificate of taking was filed on February 10, 1995 recorded in the Land Records of Norwalk describing the property at 5-15 South Smith Street, Norwalk, Connecticut consisting of 12.61 acres of Real Estate. The parties on January 13, 1995 agreed to have the Clerk of the Court issue a certificate of taking pursuant to Section 8-129 of the Connecticut General Statutes to extend the date to February 14, 1995 (Ex. 8).
DeBeradinis first purchased 6.31 acres of land with a terminal building on it from Vallerie Transportation Services, Inc. on September 4, 1985, for 1 Million Eight Hundred Thousand Dollars (Ex. 9) $1,800,000. At the time that DeBeradinis first saw the property, his son, Louis DeBeradinis Jr. ("Louis Jr.") had brought him to the site to show him the property for a Rock Crushing operation/business. At the property was the existing terminal building, a specialty building for trucks with no other buildings on the property. DeBeradinis had been in the business as a common carrier in the trucking industry who sold to Adley Truckers in 1959. DeBeradinis testified that he was a successful developer who sold properties which he acquired and renovated. DeBeradinis was the general contractor for the construction of the larger warehouse and office building containing 48,930 square feet being used by the plaintiffs themselves for office space and for storage at the time of the taking. The terminal building of 11,843 square feet which had been on the property when purchased was the operations building for Bedrock operations. The warehouse building was constructed in accordance with plans (Exhibit 10) and completed in one year.
The plaintiff argues, inter alia, that in finding the value of the property the court should consider that there was a unity of use and interest in the utilization of the premises between CT Page 2012 DeBeradinis and Louis Jr. because of the inter related family as entities recognized in Toffolon v. Avon, 173 Conn. 525, 539-540
(1977) discussed infra in this case. In separate counts of the amended complaint Bedrock sought damages for the destruction of the rock crushing business because it could not be relocated which claim was struck down by the Superior Court (D'Andrea, J. Memorandum of Decision dated 9/21/1998). The plaintiff now argues, nevertheless, that since there was a going business on the property the court should consider it for "enhancement of the Real Estate". Louis, Jr. who was the owner of the Bedrock corporation testified that neither he nor his operation was paid by the plaintiff for his labor and materials for the business operation. The plaintiff received coastal site plan approval, a Coastal Area Management (CAM) permit, for the operation from the Norwalk zoning commission (commission) in 1989. The rock crushing business was operating as a nonconforming use since the city amended its zoning regulations. The rock crushing business was unique in this case in that it received demolition products from contractors and then recycled it into crushed stone, aggregate and other usable construction materials.
The plaintiff purchased the second parcel of land (the Can-Len parcel), which consisted of 2.5 acres of land fronting along the Norwalk River, from Can-Len Development Corporation on September 26, 1989 for $1,300,000. In 1990, "due to decreased demand for the plaintiff's product and increased demand from local contractors for the disposal of the raw materials, the plaintiff began stockpiling materials" on the water-front Can-Len parcel. See DeBeradinis v. Zoning Commission, 228 Conn. 187, 191 (1994). In August, 1990, the plaintiff filed an application for zoning approval and coastal site plan review with the commission regarding the expansion of the recycling business onto the Can-Len parcel. Specifically, the plaintiff sought approval for the temporary stockpiling of recyclable materials on the Can-Len parcel. At its meeting of November 28, 1990, the commission approved the expansion plan on conditions, among which were requirements that the plaintiff construct a nine foot wide earthen berm along the waterfront to protect the riverfront and dedicate a fifteen foot wide public accessway, by easement, to the City of Norwalk. See id., 191-94.
The plaintiff took exception to the conditional approval and appealed to the Superior court, which in effect reversed the commission's decision, thereby voiding the approval. See id., 194. "In reaching its decision, the trial court reviewed the CT Page 2013 report before the commission and concluded that it contained sufficient evidence to support the commission's finding that the potential adverse impacts of the plaintiff's proposal on future water-dependent development opportunities and activities were unacceptable. The Superior court, however, also concluded, on statutory grounds, that the commission had acted illegally by conditioning the approval of the plaintiff's application on the grant of a public access easement along the waterfront because the condition did not mitigate the potential adverse impacts of the proposal." Id.
The Connecticut Supreme Court heard the plaintiff's appeal and upheld the trial court's decision in DeBeradinis v. ZoningCommission, 228 Conn. 187 (1994), cited above. Specifically, the Supreme Court concluded on the basis of the record that "there is substantial evidence supporting the commission's finding of potential adverse impacts on future water-dependent development opportunities and activities." Id., 202. The arguable effect of the court decision was that the plaintiff had no permit to use the waterfront Can-Len parcel for its proposed industrial use and existing stockpiling there was in violation of zoning and CAN regulations. There was no evidence that the plaintiff had made further application to expand the recycling business onto the Can-Len parcel, and the parcel was unused prior to the taking.
The property has also been the subject of some correspondence from the U.S. Army Corp of Engineers (ACE) regarding unauthorized filling activities along the river in connection with the plaintiff's application for an ACE permit for a proposed bulkhead, dredging on the waterside of the bulkhead and filling on the inland side of the bulkhead. These activities, according to ACE staff, predated the ownership by the plaintiff, [see ACE's letter to Can-Len Development Corporation (predecessor in interest to the plaintiff),] dated September 19, 1983, (defendant's exhibit D), but the liabilities to correct the problem ran with the property. In a letter dated April 24, 1992 (defendant's exhibit A) and a memorandum dated April 7, 1993 (defendant's exhibit E), ACE informed the plaintiff that until the matter of the existing unauthorized filling resolved to its satisfaction, ACE would not consider any application submitted by the plaintiff. There is no evidence that the plaintiff had cured the violation prior to the taking.
The plaintiff also applied to the Connecticut Department of Environmental Protection (DEP) for permission to install the CT Page 2014 bulkhead, waterward of the mean high water line along the Can-Len parcel. In a letter dated February 19, 1992, DEP informed the plaintiff that based on an initial review "the proposal appears to be inconsistent with state policies, standards and criteria making it unlikely that a recommendation for permit approval can be made for your project as currently designed." (Defendant's exhibit B.) In a subsequent letter, dated September 18, 1992, DEP informed the plaintiff that the "resources along the entire shoreline of [the site of the proposed bulkhead] have been identified as intertidal flats and tidal wetlands" and that `[b]oth of these resource types are identified in state and federal law and regulations as habitats to be preserved and enhanced." (Defendant's exhibit C.) DEP reminded the plaintiff that in the application submissions to date he had not met the burden he bore in "demonstrating consistency with the applicable state policies and standards" and that the failure had "resulted in the preliminary determination of inconsistency of which you were informed in February of this year." (Id.) In addition, DEP informed the plaintiff that there was a "significant backlog of pending applications" and that DEP could not give him "a definitive time frame for substantive review of this application although, based on the number of applications in the queue, it would likely be some time." (Id.) There was no evidence presented that the plaintiff had made efforts to alleviate DEP's concerns while the application was pending, and for three years DEP took no action. In a letter, dated July 7, 1995, DEP informed the plaintiff's attorney that it had closed the plaintiff's permit application since DeBeradinis had ceased to be the record owner of the parcels after condemnation on February 10, 1995. (plaintiff's exhibit 25.)
The plaintiff in this case concedes he needed to obtain permits from ACE, DEP and the City of Norwalk for the construction of the proposed bulkhead, dredging on the waterside of the bulkhead and filling on the inland side of the bulkhead.
The plaintiff testified that from 1991 up to the date of taking the plaintiff had circulated a brochure in the market seeking tenants for the main building requesting $8.50 per square foot, net, net, net as rent. He admitted that he failed to find anyone willing to pay such a rent, though he had received, and rejected, offers for $6.50 per square foot.
The highest rent which Bedrock, Inc. paid to the plaintiff prior to the date of taking was $100,000 per year gross, CT Page 2015 inclusive of the plaintiff landlord's obligation to pay taxes from that rental income received and to lease rock crushing equipment owned by plaintiff to Bedrock, Inc.
The plaintiff's appraiser, Ronald B. Glendinning (Glendinning) estimates the market value of the property taken at $12,970,000. The defendant's appraiser, Roy L. O'Neil, Jr., (O'Neil) values the property at $4,590,000. The plaintiff seeks additional compensation of $8,540,000, which is the difference of Glendinning's estimate and the amount of compensation deposited by the defendant.
The plaintiff argues that the evidence in this case demonstrates "The need for a reassessment of damages in accordance with Mr. Glendinning's well reasoned and accurate appraisal report of $12,970,000." The plaintiff asserts he suffered this loss because as a result of the taking of his property by the defendant his property had not reached its full economic potential. The Glendinning Report (Ex. 41) assumes that the plaintiff's evidence at trial amply demonstrates the reasonable probability of obtaining all necessary permits from ACE and DEP to operate a water accessible business operation with the construction of a bulkhead along the Can-Len parcel.
Norwalk argues the evidence presented at trial to the contrary demonstrates that the plaintiff was not likely to obtain the required permits to build a proposed bulkhead along the Can-Len Parcel thereby making it inaccessible to water traffic use and therefore the property cannot be enhanced for that reason. Norwalk argues that the plaintiff failed to demonstrate that the special use of his land for a rock crushing business and other commercial purposes is not the highest and best use of the property. Norwalk argues that the property is more adaptable to general rental purposes and that the court accept the O'Neil evaluation.
"Under our law, a state referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises. . . . Thus there is effective legislative sanction for the authority of the referee independently to determine a value for condemned CT Page 2016 property which is less than that . . . agreed on between the condemnee and the taking authority." (Internal quotation marks omitted.) Mincucci v. Commissioner of Transportation,211 Conn. 382, 388 (1989).
In this case both appraisers disagree as to the highest and best use of the property and both appraisers use different approaches to evaluation.
Norwalk requests the court to reject the Glendenning Report because it does not use all three approaches to evaluation and relies on the unlikely assumption for bulkhead and other permit approval which it is unlikely to obtain within a reasonable amount of time, if ever, so as to enhance its market value.
"[A] trial court may seek aid in the testimony of experts, but must ultimately make its own independent determination of fair compensation . . . on the basis of all the circumstances bearing upon value." (Citations omitted; internal quotation marks omitted.) Robinson v. Westport, 222 Conn. 402, 412 (1992).
"[T]he trier arrives at his own conclusion as to the value of land by weighing the opinion of the appraisers, the claims of the parties in the light of all the circumstances in evidence bearing on value and his own general knowledge of the elements going to establish value. . . . No single method of valuation is controlling, and the referee is entitled to select the most appropriate one under the facts as he finds them." (Internal quotation marks omitted.) Feigenbaum v. New Britain Housing SiteDevelopment Agency, 164 Conn. 254, 261 (1973). "In any assessment case in which the trial court is confronted with conflicting appraisal methods, it is a proper function of the court to give credence to one expert over the other." Newbury Commons LimitedPartnership v. Stamford, 226 Conn. 92, 99-100 (1993). "The credibility of expert witnesses and the weight to be accorded to their testimony are within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible." Transportation Plaza Associates v.Powers, supra, 203 Conn. 378.
"The amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair CT Page 2017 price of the land. . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land, assuming, of course that a market exists for such optimal use. The `highest and best use' concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will mostly likely produce the highest market value, greatest financial return, or the most profit from the use of a particular (piece of real estate." (Citations omitted; internal quotation marks omitted.) Robinson v. Westport, supra, 222 Conn. 405-406.
The first decision this court must make is what is the highest and best use of the property taken.
In determining the highest and best use of the property, this court needs to determine whether the special use of the land as a rock crushing business in fact enhanced the value of the land taken and whether there was a reasonable probability for the issuance of the bulkhead permits that would maximize his special use of the land for the operation of a rock crushing business.
"The usual measure of damages is the fair market value of property, in the determination of which it is proper to consider the use which is being made of the property if, in truth, that use of the property enhances its value." Feigenbaum v. NewBritain Housing Site Development Agency, 164 Conn. 254, 258
(1973). "We have consistently applied the rule that the existence of a going business on the land is an element to be taken into account as indicating the highest economic use to which it may be put." Id., 259.
"In relation to the description of `special use' we have said that it serves only as a means of expressing an effort to include, as a significant element of value, the private or special use or purpose which the property had for the owner. . . . If the owner has adopted a peculiar mode of using the land, by which he derives profit, and he is deprived of that use, justice requires that he be compensated for the loss to himself. It is the value which he has, and of which he is deprived, which must be made good by compensation." (Citation omitted; internal quotation marks omitted.) Id., 260.
The plaintiff argues that his use of the property for a rock crushing/recycling business constituted a special use or special purpose and that just compensation should be based on the special CT Page 2018 use of the property that enhanced the property's value.
The defendant argues that the plaintiff has merely proven that the business conducted by Bedrock, Inc. involved special use, but the plaintiff has failed to establish that the property was a special purpose or use property, meaning that the property had been adapted to such a unique use or purpose that it could have no other use than its use for recycling business. The defendant argues that the fact that the main building was built as a rental building, the plaintiff had been trying to rent it, and the operation building had some rental history indicate that the property was not a special use property. It is illogical, in the defendant's opinion, for the plaintiff to argue that because the property was used for a special purpose it was therefore a special use property. The defendant argues that the plaintiff has failed to establish that the special use he had of the property constituted the highest and best use of the property, and could not have other, more profitable, uses.
There is ample evidence, not disputed by either party in this case, that the land taken was specially used as a rock-crushing business. Because the land had a legal nonconforming use as a rock-crushing business, and the business could not be practically or legally relocated elsewhere in the vicinity, a buyer would be willing to pay a premium for nonconforming special use, and the court should consider this factor in awarding just compensation, see Feigenbaum v. New Britain Housing Site Development Agency, supra, 164 Conn. 257-58, if that use in truth enhanced the value of the land. See Laurel, Inc. v. Commissioner of Transportation, supra, 180 Conn. 39.
The Court concludes in this case that the plaintiffs property is a special purpose or "special use" property. A rock crushing and recycling operation can be located only in a few locations. There are no other sites in Norwalk for this type of business operation. The property has a desirable location because of its proximity to the Connecticut Turnpike. This special use is a significant element of value.
As discussed supra the plaintiff is not seeking damages for the value of the business but only as it enhances the value of the real estate.
In Brothers, Inc. v. Ansonia Redevelopment Agency,158 Conn. 41, the plaintiff argued that he was operating a profitable junk CT Page 2019 business which was unacceptable in the immediate vicinity and that the use being made of the property under these circumstances served to place it in the category of a special use. Likewise in this case, the Court concludes that the property is unique and falls within the category of being suitable for special use.
The plaintiff argues that the court should consider that there was a unity of ownership in its consideration of the use enhancing the value of the land. Although there is a legal separation of ownership in this case between the DeBeradinis owning the land and equipment of the rock crushing business owned by his son Louis Jr, the court concludes that the use between different inter-related family entities and persons in this case is effectually a unity of ownership. There is a unity of use and interest between the operating corporation of the rock crushing business and the individual property owner. (See Toffolon v.Avon, 173 Conn. 525, 539-40 (1977)).
Based on the foregoing, the court finds the highest and best use of the property is for the continued commercial rock crushing/recycling purposes as utilized by the plaintiff and his son. The owner of the property has adopted the method of using his property for his benefit and the benefit of his son's business which cannot be overlooked and is likely to bring the highest value.
Although in Feigenbaum and Brothers the landowners were also the owners of the businesses being run on their properties, the court in this case because of the relationship of the parties (father and son) equitably establishes the unity of ownership.
The court rejects the opinion of defendants' expert O'Neil that the highest and best use is more adaptable to general industrial rental use. Even O'Neil's report (Def. Ex. H, pp. 28-30) recognized that the "subject buildings represent a substantial contribution to value and they are in good condition," therefore it is "infeasible (sic) to demolish them and redevelop the site." "Given neighborhood land use, physical conditions at the site, local zoning and CAM regulations and the still uncertain state of the Connecticut industrial economy, the continuation of the present uses are considered the highest and best use of the subject property."
Central to the dispute between the parties regarding what constitutes the highest and best use of the property, is the CT Page 2020 issue of whether there was a reasonable probability at the time of the taking that the plaintiff would be granted the necessary permits for the construction of a bulkhead allowing future waterborne transportation.
The plaintiff makes the following argument in support of his claim that there was a reasonable probability at the time of the taking that he would be granted the requisite permits. The existing zoning regulations had allowed nonconforming use of the property as a rock-crushing business. The defendant had approved CAM permits for both parcels of property for non-water dependent use. ACE and DEP would likely grant bulkhead permits again on the basis that they had earlier granted the permits to the plaintiff's predecessor in interest, the Can-Len Development Corporation, which received permits from both ACE and DEP granted permits in 1969 but allowed them to expire in 1972 without having built a bulkhead. (See plaintiff's exhibits 45 and 46). The court's voiding of the illegal conditioning of the approval of the CAM permit for the expansion of the existing non-water dependent use onto the Can-Len parcel in his earlier dispute with the Norwalk zoning commission, see DeBeradinis v. ZoningCommission, 228 Conn. 187 (1994), had no adverse impact on future water dependent use of the parcel. The nonaction of ACE and DEP in processing his application for the bulkhead permits did not indicate any likelihood of rejection. The defendant city would have no option but to approve a water dependent use of the property after it had twice approved a CAM permit for the non-water dependent use, provided that ACE and DEP would approve the bulkhead permits, because the defendant had no jurisdiction beyond the mean high water mark and the power to approve the bulkhead permits lay exclusively with ACE and DEP. Historically both ACE and DEP had granted bulkhead permits for sites similar to that of the plaintiff and there was no known denial by either agency of any bulkhead permit along the Norwalk River.
The defendant argues that the evidence points to the improbability in the near future of the issuance of the permits for the construction of a bulkhead and for the expansion of business onto the Can-Len parcel. The defendant argues further that even if assuming that the permits would be ultimately issued, the plaintiff has failed to establish the likelihood that the permits would be granted in a timely manner that would influence a potential buyer of the property to pay a premium price for the reasonable probability. The defendant argues that the approval of the existing bulkheads along the Norwalk River CT Page 2021 had no relevance for the probability of the approval for the permits sought by the plaintiff because each bulkhead permit was issued on the basis of uniquely different facts of the applicant's property, construction plan, and environmental protection measures.
"[T]he true issue is, not the value of the property for the use which would be permitted if a change in zone was made, but the value of the property as zoned at the time of the taking as it is affected by the probability of a change." Budney v. Ives,156 Conn. 83, 89 (1968), citing State v. Gorga, 26 N.J. 113, 117,138 A.2d 833 (___).
Norwalk produced at trial the testimony of Frederick A. Huntley, supervising environmental analyst, with the State Department of Environmental Protection since October of 1977. Huntley routinely assists the permit analysts who actually review permit applications and environmental impact assessment.
In the years 1992 to 1995 he made recommendations with regard to permit applications. Huntley observed the outcome of various hearings on permit applications and was able to advise the applicant as to the likelihood of success. Huntley testified that there had been changes in the procedures and practice in the statutes or regulations. Both in 1969, the year Can-Len applied for a permit, and in 1992, applications would be made to his commission. Huntley was familiar with the application of Louis DeBeradinis D.B.A. Bedrock on January 24, 1994 and supervised the analyst responsible for the review. He was also familiar with the 1969 permit that was issued to the same property (Cam-Len). Huntley to arrive at his opinion reviewed the Can Lem permit originally issued which had expired and information of the DeBeradinis application. Based upon all the information he reviewed in the file his recommendation to the ultimate body which would decide on the permit would be that the project was inconsistent with certain policies of the Coastal Management Act and it was unlikely that a permit would have been issued. (See Exhibit 23).
Based upon the evidence adduced at trial the court concludes at the time of the taking there was no reasonable probability of the issuance of the permits that would enhance the value of the property taken. At the time of the taking ACE would not even consider the application unless the plaintiff cured the existing unauthorized filling and the plaintiff had not taken any action CT Page 2022 to cure the violation. In addition, the plaintiff misinterprets the DEP letter dated September 18, 1992 (Exhibit C) to suggest that DEP would probably approve his application. The letter only indicated that ACE and DEP had different enforcement standards. There was no promise by DEP that it would waive its enforcement action and help the plaintiff get around its legal obligation. In addition, DEP in the same letter could not give him "a definitive time frame of substantive review" Huntley testified at trial it would be a lengthy waiting period for the review, with three to four hundred applications pending at the time. For three years prior to the taking of the plaintiff's property in February 1995 there was no action from DEP.
Furthermore, contrary to the plaintiff's argument, there is no reasonable basis for the plaintiff to assume that there was a reasonable probability that the defendant city would approve CAM and special or site plan permits for a water dependent use of the property. The Supreme Court concluded after a review of the trial record over the commission's zoning decision that "there is substantial evidence supporting the commission's finding of potential adverse impacts on future water-dependent development opportunities and activities." See DeBeradinis v. ZoningCommission, supra, 228 Conn. 202.
The plaintiff cannot rely on the facts that his predecessor had received permits from ACE and DEP in 1969 to build a bulkhead on the Can-Len property fronting the Norwalk River. Environmental regulations change with time and the construction plan for the property must rest on its own facts at the time of the application.
The speculative approach as its value assuming the waterborne transportation in the Glendinning report is rejected.
We now turn to how the property is enhanced by its Special Use.
The plaintiff has given the court no evidence about the enhancement value of the rock crushing business as a special use to the property. There is no evidence about the profits of the business operation and the plaintiff's share of the profits at the time of the taking. The plaintiff's appraiser, Glendinning, indulges in speculation in predicating his evaluation on the assumptions about the reasonable probability of the issuance of the bulkhead permits allowing waterborne transportation and of the expansion of the nonconforming business onto the Can Len CT Page 2023 parcel. His income capitalization approach, considers the recovery to the owner of the residual value of the property after a seven year "holding period," during which period it was assumed that the business would have expanded to the Can-Len parcel and used waterborne transportation with the bulkhead in place during year three of the holding period. (See plaintiff's exhibit 41, pp. 63-78).
The defendant argues that in this case the loss of the special use was only a loss of rental income and that the court should only consider the loss to him as a landlord. Contrary to that position however as previously discussed a willing buyer would be willing to pay a premium for the advantages of the nonconforming use of the land together with location and other related factors.
The plaintiff however has shown the nature of the relationship and that generally such a relationship make the business in this case essentially owner occupied without separating the two in their legal sense.
The Glendinning report discussed comparable business operations and that only Oneglia Gervisini in Bridgeport both recycled and sold the materials and consequently the plaintiff's unique nature of the business and had growth potential. The defendants argument ignores the reality that it was an intra family relationship. (See Toffolon v. Avon, 173 Conn. 525 (1977)). While in Toffolon
they were different operating entities the plaintiff, argues thatToffolon stands for the proposition that the Court may consider the operation of a business on the property in an intra family situation, as here, and in making an equitable award of just compensation it ignore the artificial distinctions. The plaintiff argues even without obtaining the necessary permits but for the taking the business would be profitable and allowed to grow.
In reviewing the Glendinning report Exhibit 41, Mr. Glendinning used the cost approach and income approach for his opinion of value. He rejected the sales approach because he asserts that recent sales in the area did not involve waterfront property so as to provide significant information for value. He did however use such sales for developing his opinion as to land value. His opinion of land value (vacant) exclusive of the terminal building and warehouse building being $6,770,000. DeBeradinis however paid 1.8 million dollars which included the terminal on 6.31 acres. The Can-Len purchase involved the acquisition of 2.5 acres. The O'Neil analysis reached an opinion as to land value vacant of 1.8 CT Page 2024 million dollars for parcel B (The property originally purchased of 6.31 acres with the terminal on it) and for parcel A (Can Len property) of $690,000 for a total of $2,490,000.
The O'Neil analysis of vacant land above discussed is based upon comparable sales (Exhibit H, pp 31-43). The Glendinning Report (Exhibit 41, pp 42-53) considered supporting sales exclusive of land and buildings and site improvements of $6,770.000.
The plaintiff argues that the Glendinning evaluation of $12,970,000 is further buttressed by two additional items from the evidence. The first is that the direct costs are in excess of $9,000,000 without appreciation in land value and the actual cost of the real estate of $3,100,000.00 (Exhibits 9 and 13) without appreciation in value for either assemblages.
The plaintiff in this case called as a witness, Joseph Gambino, who did a cost study to construct the existing buildings on the site. Gambino testified that the terminal building had no actual plans but the larger warehouse building did. Gambino opined that his report represents the replacement value of the buildings in 1995 under normal industry practices — "general contractor bidding" from a set of documents in a competitive environment. Gambino testified the cost of constructing the terminal building is $852,932, as of February 10, 1995. He further testified that the total cost of the two buildings and site improvements was $5,754,843. as of February 1995.
The O'Neil report (Exhibit H, pp 44-47) which used the Marshall Swift calculator for construction costs rather than the more reliable estimate of Gambino opined that under the cost approach the cost of the terminal building would be $553,754; Warehouse and Office, $2,558,780; site improvements $276,973 for a total of $3,389,507. The O'Neil report (Exhibit H, p 46) attributed an unrealistic 30% economic obsolescence to the building, and unrealistic 20% depreciation to the site work.
The Glendinning Report (Exhibit 41, p 60) takes no economic obsolescence and only estimated depreciation based upon the economic age — Life method of the buildings and site improvements (See Exhibit 41, p. 60) estimating value after depreciation of $2,896,362 for the main building; $911,729 of the terminal building; and $1,538,815 for site improvements. CT Page 2025
Glendinning's final conclusion via the Cost Approach (Exhibit 41, p. 62) adding the value of the land at $6,770,000 and entrepreneurial profit of $857,677 is rounded to $12,970,000.
 Conclusion
The Court finds that the plaintiff has failed to show that the value of the land is enhanced by the reasonable probability that the plaintiff would obtain all necessary permits in a reasonable amount of time to influence a prudent investor that bulkheads could be constructed for water dependent use of the land.
The plaintiff has failed to show that the special use or purpose of the property enhanced the value to him.
Accordingly, the court finds that the value of the land based upon the evidence and viewing of the property is 2.5 million dollars rather than the value of $6,770,000 as shown on page 62 of the Glendinning report (Exhibit 41).
The Court finds that the fair market value of the property at the time of the taking is as follows:
 Costs of building in 1995 5,754,843 less depreciation at 6.5% 351,044
 Value of Building 5,403,799 plus value of land 2,500,000
$7,903,799
The Court disallows the claim of moving costs because the equipment would in all probability go with the sale of the property as the highest and best use decided in this case.
Accordingly, Judgment may enter to increase the amount of compensation from that previously paid by the defendant by the amount of $3,473,799.00 plus interest at 5.77% the agreed rate of Treasury Bills pursuant to C.G.S. § 37.3(c) from February 10, 1995 Plus Taxable Costs.
FRANK S. MEADOW, CHAIRMAN JUDGE TRIAL REFEREE
HUGH C. CURRAN, JUDGE TRIAL REFEREE CT Page 2026
GEORGE W. RIPLEY, JUDGE TRIAL REFEREE