[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This proceeding was instituted by Heidi Lawson against her parents, Blair and Louise Lawson, in nine (9) counts. It was subsequently reduced to six (6) counts, setting forth three (3) thereof against Blair and three (3) against Louise. The three (3) counts against Louise were withdrawn during the course of the trial, leaving only those three (3) counts against Blair. The allegations set forth in those three (3) counts are: Willful Battery, Wanton Battery and Intentional Infliction of Emotional Distress.[1] The plaintiff (hereinafter "Heidi") is thirty-six (36) years old and currently resides in Tucson, Arizona. The defendant ("the father") is sixty-five (65) years old, and resides in Morris, Connecticut, in the family home at 111 Todd Hill Road.
The evidence established that Heidi was a very intelligent child who was extremely successful in grammar school. She was gregarious; had a strong desire to be the center of attraction; athletic; happy and healthy; living in a happy, loving home with her parents. In addition to her academic success at school, she received numerous commendations from her teachers. She traveled to Austria with her family on a skiing trip and went on vacation to St. Thomas with her parents and a friend, again at the parents' expense. She hiked with her father. He called her "his little princess." There was also a skiing trip to Nevada. She took pottery courses, jewelry design programs, and studied ballet. She was CT Page 13448 completely supported financially and morally in all of these educational, athletic and artistic programs by her parents. She became a better than average tennis player.
After she completed high school, she enrolled at St. George's School in Newport, at age thirteen, where she was extremely successful academically. She played basketball at St. George's. She crewed for two years as well. While at St. George's, she filed an application for admission to Duke University. In that application, she credited her accomplishments and her exceptional quality of life to the love and encouragement that she received from both of her parents. However, while there, she gradually became afflicted with Bulimia or Anorexia, depending on whose characterization one chooses to accept. Her parents, upon the realization of what was happening to her, arranged to have her treated by a Dr. Reynolds.
She claims to have done some drinking and some smoking of marijuana while at St. George's. It has been suggested that her health was affected and that she missed some seventeen days of school consecutively. However, those seventeen days were the result of staying longer in Austria on the skiing trip. In addition to the Bulimia, the only other significant health factors that she had was a case of Herpes Labialis (cold sores), a fractured leg while skiing, some ear problems, and the usual childhood illnesses. When she fractured her leg, both parents rushed to the scene to be with her and to comfort her.
She enjoyed a very close relationship with her older sister, Laura, for many years. Laura was at Colby College in Maine while she was at St. George's and would drive down to spend weekends with her. They stayed in the same room, in fact, often in the same bed, both in Newport and at their grandmother's home in upper New York state. In their earlier days, she and her sister and a couple of their close friends would hide away in the attic or a secretive place in the house with flashlights and tell ghost stories. Her sister, who lives in San Diego, and she continued this close relationship after she withdrew from Clemson University after a few months because she was dissatisfied with the school. She enrolled at the United States International University in San Diego, and lived with her sister in a small apartment for some time. During this time, her education and her living expenses were subsidized by her parents, as were her sister's. She, however, would spend more money than she should on items such as Chinese herbs, and her sister would be called upon to contribute to her support. After several months at the United States International University, she applied for and was accepted at the University of California at Berkeley.
Her father went to California to help her with her movement to Berkeley CT Page 13449 and her interviews. They spent at least two nights in a hotel together. For a time prior to entry into Berkeley and at Berkeley, she was involved with numerous therapists. She participated in the Berkeley Psychic Institute and the Tampala Institute. While involved with the Berkeley Psychic Institute, she met one Rick Mehalko, who has become her significant other. They have been engaged on and off for a number of years. They have lived together for several years and claim to have been celibate for the last three or four years because of problems that she experiences during periods of intimacy. Before the period of celibacy arrived, however, she did experience at least two pregnancies which resulted in abortions. Prior to Mehalko, she had become involved with other young men, at least one of whom she claims was abusive to her.
In 1991, 1992 or 1993, she asserted claims of sexual abuse by her father from the time that she was approximately five years old and continuing until she was approximately seven years old. She alleges that he would come to her bedroom at night and get into bed with her, that he would touch her, that he would masturbate, and that he would attempt to cause her to touch him. On one particular occasion, she claims that he became enraged and grabbed her by the throat, nearly choking her into a state of unconsciousness, and then she suddenly felt pain in her vagina. Despite the repetition of these acts, after which she claims to have felt dirty and went to the bathroom curling up on the floor in a fetal position, she never told anyone — her sister, who confided her most intimate thoughts and activities with her, her mother, her best friend, her doctor, her teachers, absolutely no one.
She also asserts that she lit fires from Kleenex tissues, withdrew into the woods, cried often, and missed meals. It is from this withdrawal and crying that she believes her mother knew what was happening, despite the fact that she never told her. She further asserts that at St. George's, she felt dirty, inferior, and a bad person because the alleged abuse had happened to her. The closest she came to telling her mother anything at all was when she developed some soreness in her vagina and some "white stuff," as she explained it, around it. She said her mother responded that it would go away and it would be all right. She said it did. It is somewhat significant to note that her medical records, as maintained by her pediatrician and her family physician, set forth no allegations whatsoever, no findings, no suspicions, not a hint of any type of sexual abuse, as do her hospital records, which are equally blank with respect to that subject. In fact, she herself acknowledged that there were no medical records from her childhood that support her claims.
To reiterate, during this period of the abuse that she claims occurred, which she says she knows did, in fact, happen to her, she did not tell anyone, anywhere, anytime, any way, that she was being abused. CT Page 13450 She didn't tell her mother, her sister, her caretaker with whom she had a close and loving relationship, her relatives, her friends, neighbors, physicians, teachers, coaches, or anyone in her church community. She knew the most intimate details about the life of her closest childhood friend. However, she did not tell her that she was abused. There is not a single writing or drawing from her diary or elsewhere that supports her claims.
The court heard some evidence about a second instance wherein she was camping with her father in the Adirondack Mountains. At that time, she asserts that there was additional sexual abuse. This claim, however, was never included in her complaint, and she indicated she was not making it a part of her complaint in this litigation. Questioned by the court at one point about the veracity of these statements, she indicated that it was true. Moments later, she said, "I'm saying that that's what I was experiencing at that time, and I was dissociated, and it's not something that's in my continuous memory, but it is what I was experiencing that night. What my civil claims are is what my continuous memory is." Again, under the questioning of the court as to whether or not this incident ever happened, this Adirondack incident, she answered, "I don't know." Subsequently, under questioning by the defense counsel, he again asked her, "Is it your testimony that it happened, or is it your testimony that it didn't happen?" The plaintiff responded, "It is my testimony that that happened. That is what I wrote, that's what I was experiencing at that time." When asked, "In your mind, you believed it happened, but as you sit here today you know it didn't happen." The plaintiff responded, "As I sit here today I do not know. That's not my continuous awareness." When asked whether her response meant, "It did or didn't happen?" She responded, "It did happen — that's what was happening to me when I wrote it in the journal. I — I have — I don't — I'm not aware of it throughout my daily life." Finally, she acknowledged that she testified during a November 29, 2000 deposition that it was her understanding that she was abused in her bedroom but never when she was alone with him in any place outside the home.
Her father and mother, while consistently and continually providing financial support to her for her activities, education, and her living expenses until she was approximately twenty-seven (27) years old, never suspected what she claims occurred. Their support did not waiver even though she withdrew from several colleges without achieving any significant academic success. As of the date of trial, she remains a beneficiary under the terms of their wills.
The plaintiff testified that she did not repress the memories of what she claims happened to her. She testified that the alleged events have always been part of her continuous memory. Over the summer of 1993, she CT Page 13451 told her sister, Laura, that she had recently recovered a memory that she was sexually abused as a child.
In 1990, the defendant told the plaintiff that he intended to discontinue supporting her within the next year which would give her sufficient time to find employment and provide for herself. Within a short period of time thereafter, she began telling people that she was molested as a child, and some time later, that her father was the perpetrator of this molestation. When she arrived at Berkeley, immediately prior to entering that institution, she undertook certain therapies for anger management.[2] It should be remembered that her father traveled alone with her to help her locate housing, and they spent two (2) nights in a hotel without incident, and each seemed very happy to be with each other.
It appears to this court that Heidi's somewhat fragile mental state began to degenerate after her arrival at Berkeley and her involvement with the Berkeley Psychic Institute, the Tampala Institute, and the various and sundry therapy and support groups to which she was attracted. The subject matter of these varied from anger management to incest. It is highly significant that during this period, her present fiancé/ex-fiancé, Rick Paige, entered her life. Interestingly enough, he, too, claims to be a victim of sexual abuse which supposedly occurred at the hands of his grandfather and his mother. There is a glaring lack of specificity as to just what did happen, if anything, between his grandfather and him and his mother and him. If it did happen, he is not sure that it was sexual abuse. He, too, attended or monitored an incest survivors' support group, yet told the court that he really didn't know what incest was by definition. He, too, appears to have a deep-seated virtual hatred for his family, which motivated and resulted in legal action wherein he changed his name in May of 1991, as he remembers, from Richard Mehalko to Rick Paige.
His secondary education consists of a "few weeks" at the University of Michigan and Edinborough State in Pennsylvania, for approximately a year. He also audited courses at Stanford. Prior to meeting Heidi, he was in Brazil teaching meditation. He was kidnaped by "guys with guns" and held for ransom. One of his friends paid the ransom, and he was released. He admits that he has difficulty in convincing people that he, in fact, was kidnaped and that a ransom was paid. Upon his return, upon meeting Heidi, he thought she would be "good for `my' program." His employment seems to have been teaching meditation and related subjects, if any, working as a tutor for a foreign student at Stanford University in a graduate program (despite his lack of an undergraduate degree); his efforts at journalism as an independent contractor for the Mercury News in that area; as a fundraiser for Women's Office Workers' Union Fund; CT Page 13452 ghostwriting; yoga and meditation; and English as a second language. However, like Heidi, he has never held a steady job for any period of time or ever generated any income of substance. The impression created in this court's mind from his testimony and the testimony of others is that of a narcissistic, ne'er do well who strives to control people. His control over Heidi, and perhaps, domination as well as his influence on her therapy in Arizona and his would-be direction of this litigation also leads to the conclusion of this court that he is as deeply involved in this litigation as is Heidi.
They continue to reside together, however, his description of any attempt at intimacy at this point appears to be repulsive and damaging to Heidi. It is during the period of their relationship that this claim of sexual abuse seems to have been generated and nurtured. Each has participated in what appears to be a psychic institute called the Church of Divine Man — Jesus Christ, in which contributions and tuition payments are tax deductible. Upon graduation, each became a minister in this church, although neither seems to be maintaining any such ministry at this time.
She is now involved teaching dance therapy in the environs of Tucson and is involved with two primary therapy groups. One is the Pastoral Care Center of Counseling, where her therapist is one Maureen Brand. A second therapist is Diane McLane, who is affiliated with Las Familias, a therapy for families with a history of sexual abuse. Each has diagnosed her as suffering from Post Traumatic Stress Disorder (PTSD). That diagnosis was confirmed by a psychologist here in Connecticut named Laurie Ann Pearlman, who appeared as a "forensic" witness in support of the plaintiffs claims in this litigation. While she never treated her, she did meet with her and test her.
The parties stipulated that the depositions of Maureen Brand, Diane McLane, together with the testimony of Dr. Pearlman and Dr. Opsahl, could be introduced without proof of qualifications in terms of expertise. The court is satisfied that Dr. Pearlman and Dr. Charles A. Opsahl are duly qualified to testify as experts and should be so regarded if offered as experts. The videotaped testimony of Maureen Brand and Diane McLane does not convince this court that either or both should be considered experts, not because the testimony was videotaped, but because they lack the experience, the training, and the apparent ability to qualify in that capacity. The credibility of expert witnesses and the weight to be accorded to their testimony are within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible. Transportation Plaza Associates v. Powers,203 Conn. 364, 378; New Haven Water Co. v. The Board of Tax Review,166 Conn. 232, 240; Ferri v. Pyramid Construction Co., 186 Conn. 682. CT Page 13453 There is a disturbing feature about many of these therapy programs. That is, that it is hardly uncommon for each to have its own regimen which it is trying to merchandise. It is also not uncommon for these regimens to have their own vocabularies and their own definitions. It is quite evident that many are capable of and do significantly damage their clients or patients, as the case may be. The court declines to accept their diagnoses.
Dr. Pearlman, in her curriculum vitae, recites seriatim, that she is the president of Trauma Research Education and Training Institute, Inc. She is also a partner and Research Director and Clinical Supervisor of the Traumatic Stress Institute/Center for Adult Adolescent Psychotherapy LLC, located in South Windsor, Connecticut. She lists her education licensure, her professional experience, her awards, her research grants, her professional affiliations, her consultations, her books, her videos, her papers and her publications, her presentations at scholarly and academic meetings, her presentations at professional and community conferences and workshops on approximately nineteen pages. She admits to taking sixty (60) to seventy (70) trips away from her office training other mental health providers with her theory of constructivism.[3]
Dr. Pearlman interviewed Heidi and tested her. She also interviewed persons that Heidi suggested to her. Her questions dealt with Heidi's life before 1990, and as the defendant points out, not one of them support her version of reality. Her best friend, Leslie Lewis, reported that Heidi had never suggested any form of sexual abuse, that she had no sense of any problems in the family. A former boyfriend, Frank Oliver, reported that he had asked her a number of times if she thought she'd been abused in any way and she always responded negatively. Her neighbor and coach, Betty Riley, reported she never told her about any claims of abuse, that she had concerns about Heidi's lying and stealing. Her babysitter/caregiver, one Sophie Wagner, reported to Dr. Pearlman she had never suspected nor had cause to suspect that Heidi had been abused.
Among the tests conducted by Dr. Pearlman (who also diagnosed Post Traumatic Stress Disorder) was the Minnesota Multiphasic Personality Inventory-2 (MMPI-2). This Personality and Psychopathology Assessment which, according to her, is the leading diagnostic tool in evaluating psychopatholgy. She asserted that she gave the test properly and it was appropriately graded. The data revealed that Heidi had extremely elevated scores on the scales three (3), four (4) and seven (7). She also testified that one John R. Graham was a recognized authority on the MMPI-2 and its interpretation, has written a book on specifically those three scales. The result of that testing and interpretation thereof are as follows: CT Page 13454
 (1) Marked lack of insight concerning the possible underlying causes of their symptoms.
 (2) Quite self-centered, narcissistic, and egocentric, and they expect a great deal of attention and affection from others. They've often used indirect and devious means to get the attention and affection that they crave. When others do not respond appropriately, they may become hostile and resentful . . .
(3) Likely to engage in a variety of . . . antisocial behavior . . . lying.
 (4) Often have stormy relationships with families. The family members tend to be blamed for their difficulties.
 (5) Often ostentatious and exhibitionistic. Interested in others in terms of how they can be used.
 (6) In therapy they tend to intellectualize excessively, to blame others for their difficulties.
 (7) They tend to be extra punitive and to blame other people for their difficulties.
People such as Heidi who have the combination of extraordinarily high scores known on the three-four (3-4)/four-three (4-3) code are most commonly diagnosed with personality disorder. This is substantially different and significantly distinct from Post Traumatic Stress Disorder.
The defendant called Dr. Charles A. Opsahl who is also a clinical psychologist who diagnoses and treats patients, usually within the association of the Yale University community. Dr. Opsahl was never given permission to see Heidi. He based his opinion upon the MMPI-2 administered by Dr. Pearlman; his review of all the plaintiffs medical, school and personal records; his interviews with her childhood doctors; his review of her deposition, and his observation of her during her courtroom testimony. Dr. Opsahl sent the results, the data gleaned from Dr. Pearlman's administration of the test, to another nationally renowned expert in the field, a Dr. James Butcher. The report confirms the personality disorder diagnosis which, again, distinctly differs from the Post Traumatic Stress Disorder that can often result from childhood CT Page 13455 sexual abuse. He also confirmed the interpretation of the data provided in Dr. Graham's authoritative text as was described previously. He also opined that her conduct at her deposition and during her courtroom appearances was consistent with the conduct described in the Graham and Butcher interpretations of the MMPI-2 data.
His practice differs substantially from Dr. Pearlman's. He has devoted most of his practice to patients and the supervision of neo-psychologists in their treatment of patients. She conversely has devoted most of her time to writing and traveling; as indicated, having authored many, many articles and taken many, many trips outside of the state to advance her therapy regimen. Dr. Opsahl interviewed the plaintiffs childhood family physician and the psychologist who treated her for her eating disorder. He testified that Dr. Hayes reported to him that he had substantial opportunities to observe the plaintiff during her childhood and adolescence and that he never found any indication of abuse. Dr. Reynolds, who is a national authority on eating disorders, reported that she had treated Heidi during her late teens for Anorexia. She also indicated that her parents were supportive of the plaintiffs treatments, participating in the counseling sessions and cooperating in the efforts to relieve tension and anxiety. He also interviewed her caregiver.
One of the counseling sessions under the direction of Dr. Reynolds set forth that Heidi was exhibitionistic, highly manipulative, and terminated the therapy when she was asked to accept some responsibility for her condition. In addition, Dr. Opsahl examined numerous writings and records from the plaintiff's childhood and adolescence which starkly contradicted her testimony and her claims. He further explained that he had extensive experience in the treatment and diagnosis of eating disorders which are alarmingly prevalent at Yale and among his private patients. He denied that such disorders are usually indicative of family sexual abuse as they did not develop with the plaintiff until long after the period of alleged abuse and were preceded by an unbroken history of academic, extracurricular and social successes.
A common thread that runs throughout the evidence in this case is the influence of Rick Paige. Over the years they have spent together, they exchanged stories about their youth and the events that existed and occurred therein. The therapy groups that they attended as well as the support groups complemented that common thread, and they both were widely read on the subject. In fact, in some instances of therapy in Arizona, Heidi, in fact, told the therapist that the diagnosis of Post Traumatic Stress Disorder was based upon her own knowledge and her collaboration with him. The therapist accepted that self diagnosis.
During their time together, he introduced her to Chinese herbs, and it CT Page 13456 may well have been that his claim of acupuncture was practiced to some extent on her. This is not to suggest that either one of those particular events is improper. It does, however, somewhat indicate her submission to at least two of his ideas. During their time together, as previously mentioned, neither ever held a steady job. There were junkets out of the country paid for clients or patients. There was the support from the Larson family and there were inheritances or benefits from two trust funds, one in the amount of fifty thousand ($50,000) dollars and one in the amount of twenty-five thousand ($25,000) dollars. The fifty thousand ($50,000) dollar trust was paid in two installments, and the twenty-five thousand ($25,000) dollar trust or inheritance was paid in one. All has been spent. One might clearly get the impression that Paige as well as Heidi was subsidized by her parents and her relatives. The similarity between the plaintiffs allegations and Paige's story of incest survival strongly suggest that her memories of her childhood have been tragically warped. She herself acknowledged that he was a very influential person in her life. That influence borders on being Svengalian.
A rather compelling example of the extent of this influence and its detrimental effects may be gleaned from a comparison of plaintiffs exhibits eleven (11) and twenty-three (23). The first is a seven page, single spaced, unsigned, typed letter of February 28, 1998 ("the purpose of this letter is to identify and seek redress for the non-consensual activity that occurred between Blair Lawson, born September 26, 1936, and Heidi Lawson, his daughter, born September 18, 1964, in the period 1971-1977"). This was allegedly written by Heidi, although it was written in the third person. The second is an eight page, single spaced, typed letter dated September 24, 1997 ("the subject of this letter is Ms. Christy Qualls, a lay counselor at Pantano Christian Church's group program and her relationship with Heidi Lawson, on whose behalf I am writing"). The letter was admittedly written by Paige. A perfunctory comparison of the writing forms and styles contrast with Heidi's other writings in evidence and compels the conclusion that both letters were written by Paige, who described himself as a ghost writer and a researcher by profession. This letter contributed substantially to the basis of this lawsuit and for Dr. Pearlman's opinion.
The remaining defendant, Blair Lawson, is not without his own problems. Family members freely admit that he has a very volatile temper. He is known to "blow up" and walk out of the house to cool down. On one occasion, when Heidi was a very young child, he spanked her with a belt. On another occasion, when she was a bit older, she and her sister were watching television when they were supposed to be preparing to leave the home with their parents. He became so exasperated that he took the television set, threw it down the stairs and broke it. That set was not replaced for a period of four years. The significance of his temper is CT Page 13457 apparently offered or, to some extent, relied upon to give credence to Heidi's physical violence claim that he had placed his hands on her throat, forcing her to submit to his sexual advances. This court does not accept the validity of that premise. It is simply a non sequitur.
Familial sexual abuse as well as sexual abuse in general has long haunted our society. It has been recognized by more and more authorities as time passed and its manifestation substantially years after the acts occurred has not gone unnoticed. Recognizing this problem, the Connecticut General Assembly enacted § 52-577d of the General Statutes extending the statute of limitation in these cases for a period of seventeen (17) years from the date such person attains the age of majority.[4] The nature of the harm sustained by those victims often sublimates their memories of childhood sexual abuse and dims their awareness of the damage until a later date. Giordano v. Giordano,39 Conn. App. 183, 193. The purpose of the extended statute of limitations is to afford a plaintiff sufficient time to come to terms with traumatic childhood events before that person must take action.Roberts v. Caton, 224 Conn. 483. The court has had the benefit of seeing pictures, notes, and also the benefit of testimony describing the relationship between Heidi and her parents. Her actions with her father belie the claims she is now asserting. One particular picture fulfills the axiom that a "picture is worth a thousand words." That picture shows her dancing with her father at her sister's wedding. Her eyes are bright, her smile is overwhelming, and her attitude is gleaned from that picture. It is one of happiness and love for her father.
After years of silence, she finally asserted this claim; after the family support stopped; after it was made very clear that the family had no particular affection for Rick Paige; and after her participation in the plethora of therapy programs and support groups with which she became involved. The court had the opportunity to see her as she testified; to hear about her dissociative state and the problems it has caused her, listened to the indefinite, imprecise, uncertain and incredible story that she told. Her testimony finds no consistency with the testimony of other witnesses during the period of the alleged abuse. She maintains that this is not a recovered memory and that the events that she alleges have always been a part of her continuous memory. This is inconsistent with her statement to her sister, Laura, in 1993, that she had recently recovered a memory that she was sexually abused as a child.
The so-called Adirondack incident becomes unbelievable when she says that it exists in her memory, she's not quite sure whether or not it did happen, and it is not part of her claim against her father in this case. Perhaps the word "incredible" is the most appropriate description of that particular testimony. This court is unable to find her testimony CT Page 13458 believable in any of the elements that make up this cause of action. It finds it to be a fabrication, probably the product of her collaboration with Paige, and stark evidence of her mental state. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony." (Citation omitted; internal quotation marks omitted.) Powers v. Olson, 252 Conn. 98, 105 (2000). This is so because "the [trier of fact's] assessment of the credibility of the witnesses [is] based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) In re Felicia B.,56 Conn. App. 525, 526, cert. denied, 252 Conn. 952 (2000). Sender v.Sender, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 046243 (March 9, 2001, Grogins, J.) It would seem that she is in dire need of the treatment of a qualified psychiatrist and a reputable program of result oriented therapy.
The court would be remiss if it did not compliment counsel on their skill and sensitivity in the presentation of the evidence in the case as well as their manner in the courtroom in general. Each and every one of them was thoroughly familiar with the subject matter of the case, with the rules of law that applied, and with the courtesy to be extended to opponents. Each of the parties has received a very complete, qualified degree of representation, and each has received a full measure of justice at their hands. Unfortunately, only one of the parties can prevail.
Judgment may enter for the defendant.
Moraghan, J.T.R.